AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS DE PUERTO RICO, demandante y recurrida, *v.* UNIÓN DE EMPLEADOS DE LA AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS DE PUERTO RICO (INDEPENDIENTE-AUTÉNTICA), HÉCTOR RENÉ LUGO Y OTROS, demandados y recurrentes; ESTADO LIBRE ASOCIADO DE PUERTO RICO, interventor.

*Número:* R-74-370 *Resuelto:* 13 de diciembre de 1976

440

*Vicente Ortiz Colón* y *Alfredo Nazario,* abogados de los recurrentes; *Ramón Cancio, José O. Sabater* y *Jorge López Ramírez,* abogados de la Autoridad; *Miriam Naveira de Rodón, Procuradora General,* y *Roberto Armstrong, Jr., Procurador General Auxiliar,* abogados del interventor.

EL JUEZ PRESIDENTE SEÑOR TRÍAS MONGE emitió la opinión del Tribunal.

La Constitución del Estado Libre Asociado de Puerto Rico garantiza el goce cabal de los derechos humanos, pero no deja inerme a nuestra sociedad contra el efecto de huelgas paralizantes de los servicios públicos. Abre un ancho campo a la experimentación sobre modos posibles de atender los justos reclamos de las organizaciones obreras, pero sin vulnerar los legítimos derechos de la comunidad en sí en casos de grave amenaza a su salud, su seguridad o el adecuado funcionamiento de los servicios públicos esenciales. La cuestión que plantea este caso se reduce a determinar si la Ley Núm. 142 de 30 de junio de 1961, 29 L.P.R.A. sec. 481 y ss., concuerda con nuestro ordenamiento constitucional, ya que hay modos admisibles y otros inaceptables de intentar cumplir los objetivos consignados. Especialmente nos corresponde revisar aquí la validez de una orden de entredicho provisional y de una sentencia de *injunction* permanente emitida por el Tribunal Superior, Sala de San Juan, dictaminando que la huelga decretada por la recurrente Unión de Empleados de la Autoridad de Acueductos y Alcantarillados de Puerto Rico (Independiente y Auténtica) el 25 de octubre de 1974, era ilegal por contravenir lo dispuesto en el Art. 16 de la Ley

Núm. 142 de 30 de junio de 1961 (29 L.P.R.A. sec. 496), que proscribe *a priori* e incondicionalmente la huelga de sus empleados y exige el arbitraje compulsorio de toda disputa.

Conforme los hechos incontrovertidos,[1] la huelga se prolongó hasta el 12 de diciembre, "causando perjuicios, pérdidas y daños inmediatos e irreparables a la Autoridad demandante ocurriendo una incidencia extraordinaria de averías anormales efectuadas sobre tuberías de conducto de agua y otras propiedades de la parte demandante que consideramos de naturaleza maliciosa"; puso en peligro la salud y seguridad públicas y la economía del país por afectarse parcialmente el suministro de agua potable para consumo humano y la industria, la disposición de aguas negras sin riesgo a la salud y a la contaminación del ambiente; y movió al Primer Ejecutivo a ordenar la movilización de la Guardia Nacional de Puerto Rico[2] desde el 28 de noviembre hasta el 16 de diciembre de 1974.

La Unión recurrente sostiene que la Ley Núm. 142 es inconstitucional mientras que la Autoridad recurrida sostiene

---

[1] Mediante moción suscrita el 26 de diciembre de 1974, la parte recurrente nos informó que ". . . no existe controversia alguna con respecto a los hechos."

[2] Tomamos conocimiento judicial de la Orden Ejecutiva y Proclama emitida el 28 de noviembre de 1974 (Boletín Administrativo Núm. 3017), que en lo pertinente expresa:

"Por cuanto: Debido a los actos de sabotaje llevados a cabo en el conflicto laboral entre la Unión Independiente Auténtica de los empleados de la Autoridad de Acueductos y Alcantarillados de Puerto Rico y dicha corporación pública, existe un estado de emergencia doméstica en la Isla de Puerto Rico;

"Por cuanto: El incumplimiento y desobediencia de la ley, desórdenes y la pérdida, sabotaje y destrucción de propiedad pública han alcanzado una etapa de extrema preocupación para el Gobierno y el Pueblo de Puerto Rico;

"Por cuanto: Existe un grave e inminente peligro de que ello continúe y se extienda a proporciones de mayor magnitud;

"Por cuanto: La protección de vida y propiedad restauración y mantenimiento de la ley y el orden sobrepasa la capacidad de las autoridades civiles y de las fuerzas del orden público disponibles a la Policía de Puerto Rico en este momento; . . . ."

lo contrario. Ambas partes asientan principalmente sus respectivas contenciones en las siguientes disposiciones de nuestra Carta de Derechos:

*"Sección 17*

Los trabajadores de empresas, negocios y patronos privados y de agencias o instrumentalidades del gobierno que funcionen como empresas o negocios privados tendrán derecho a organizarse y a negociar colectivamente con sus patronos por mediación de representantes de su propia y libre selección para promover su bienestar.

*"Sección 18*

A fin de asegurar el derecho a organizarse y a negociar colectivamente, los trabajadores de empresas, negocios y patronos privados y de agencias o instrumentalidades del gobierno que funcionen como empresas, o negocios privados tendrán, en sus relaciones directas con sus propios patronos, el derecho a la huelga, a establecer piquetes y a llevar a cabo otras actividades concertadas legales.

Nada de lo contenido en esta sección menoscabará la facultad de la Asamblea Legislativa de aprobar leyes para casos de grave emergencia cuando estén claramente en peligro la salud o la seguridad públicas, o los servicios públicos esenciales.

*"Sección 19*

La enumeración de derechos que antecede no se entenderá en forma restrictiva ni supone la exclusión de otros derechos pertenecientes al pueblo en una democracia y no mencionados específicamente. Tampoco se entenderá como restrictiva de la facultad de la Asamblea Legislativa para aprobar leyes en protección de la vida, la salud y el bienestar del pueblo."

## I

Encuadremos primeramente la cuestión en su perspectiva histórica, para precisar el propósito de los textos constitucionales citados. A comienzos del proceso de redacción de la Constitución del Estado Libre Asociado se debatía intensamente el problema de si dicho documento debía garantizar el

derecho a la huelga y otras actividades concertadas de los trabajadores. *La Nueva Constitución de Puerto Rico*, Ed. de la U.P.R., 1954, pág. 224. Existía gran variedad de criterios en nuestra comunidad sobre este extremo, según lo revelan los récords de la Asamblea Constituyente y otros documentos de la época.

En su informe a la Asamblea sobre la Carta de Derechos, la Escuela de Administración Pública de la Universidad de Puerto Rico recomendaba cautela. "Nadie puede negar razonablemente," se expresaba, "la necesidad de proteger hoy en Puerto Rico los referidos derechos a la huelga y a otras 'acciones concertadas'. Pero puede suceder que nuestro ingenio colectivo descubra en el futuro otros medios de resolver los conflictos en las relaciones del trabajo que sean distintos de los que actualmente existen." De ahí que se sugiriese la omisión en la Constitución a formularse de toda alusión a la huelga. *La Nueva Constitución de Puerto Rico*, supra, *loc. cit.*

Del otro lado, el Art. 23-4 de la *Declaración Universal de Derechos del Hombre*, Departamento de Información Pública de las Naciones Unidas, Lake Success, 1949, documento que afectó considerablemente la estructuración de nuestra Carta de Derechos, disponía:

"Toda persona tiene derecho a fundar sindicatos y a sindicarse para la defensa de sus intereses."

Las manifestaciones de la Declaración Universal sobre los derechos del trabajo habían generado ya disposiciones análogas en constituciones inmediatamente anteriores a la de Puerto Rico. Peaslee, *Constitutions of Nations*, ed. de 1950; Herrero y Miñón, *Nacionalismo y Constitucionalismo*, 1971, pág. 404. La tesis de la Declaración Universal hallaba también fuerte eco en el movimiento obrero puertorriqueño, según se desprende de las propuestas que sobre el particular se hicieron en la Asamblea Constituyente.

El sector que resultaría ser el mayoritario en la Asamblea Constituyente acudió a la elección de delegados a la Con-

vención con el compromiso programático de encararse al problema en la Constitución y expresar al menos el grado de reconocimiento correspondiente a las actividades concertadas ·de los trabajadores. Se afirmó en el programa aprobado al efecto a principios de agosto de 1951:

"6. Los trabajadores tendrán específicamente los siguientes derechos:

. . . . . . . , .

"c) A organizarse libremente;

"d) A contratar colectivamente a través de representantes de su libre selección. Los convenios colectivos quedarán investidos del interés público;

"e) A llevar a cabo actividades concertadas para promover su bienestar en las relaciones con sus patronos." El Mundo, vol. XXXII, Núm. 14, 461 (11 de agosto de 1951).

Se mantuvo cierta flexibilidad, no obstante, al advertirse que el programa no se encaminaba a hacer "una relación en detalle de las disposiciones que deberá contener la Constitución." No se excluía así en estos casos la protección de la salud y el bienestar del pueblo mediante el uso del poder de policía u otros medios, pero la evidencia histórica disponible no revela que se hubiera hallado para entonces un modo generalmente aceptable de armonizar los intereses en conflicto.

La posición en la Asamblea Constituyente de un importante sector minoritario fue mucho más tajante y abarcadora. En las Proposiciones Núms. 20 y 94 radicadas ante la Asamblea, el liderato de este grupo, encabezado por don Lino Padrón Rivera, don Antonio Reyes Delgado y otros, favoreció que la Constitución incluyese el siguiente lenguaje:

"Se reconoce el derecho de los obreros a la huelga y al piquete ordenado. También se reconoce a los trabajadores el derecho a contratar colectivamente, y la ley regulará las formalidades de dichos contratos. Toda estipulación que implique renuncia o limitación de alguno de los derechos aquí establecidos será nula e inexistente."

No se distinguía entre los trabajadores privados y públicos.

En la Proposición Núm. 54 del señor Paz Granela, líder obrero, se reconocía igualmente "el derecho a la huelga pacífica y demás actividades concertadas. . . ." y en la Núm. 61, de los líderes sindicales, señores Alberto Sánchez y A. M. Candelario Arce, se consignaba, como en la Constitución francesa, el derecho de los trabajadores "a que se les garantice el derecho a la huelga y al piquete pacíficamente [*sic*], según reglamentación de ley. . . ."

El liderato del otro importante núcleo minoritario en la Asamblea formuló a su vez distintas propuestas. La Proposición Núm. 103, suscrita por don Luis A. Ferré, don Miguel A. García Méndez y otros, disponía que "Nada de lo contenido en esta Constitución será interpretado en el sentido de limitar la facultad de la Asamblea Legislativa para decretar leyes para la protección de la vida, salud y seguridad de empleados y obreros." (Sec. 8.) En la Proposición Núm. 312 de los señores Ferré, García Méndez, Iriarte, Gelpí y Parkhurst se reconoció (sec. 3) ". . . el derecho a las huelgas pacíficas y ordenadas como medio de defensa de los trabajadores y empleados, así como a los patronos el derecho al paro de sus negocios en defensa de sus intereses.", pero se condicionaban estos derechos mediante un procedimiento de ventilar querellas ante la Junta de Relaciones del Trabajo (secs. 8 y 14). Poco más tarde se consolidaron los diferentes criterios dentro de este grupo y se produjo una Proposición Conjunta, la Núm. 313, en que se trataba separadamente el problema de los empleados públicos, expresándose que "Los empleados públicos tendrán el derecho de elevar quejas y agravios al gobierno y sus organismos mediante representantes de su propia selección." (I, 4.)

La propuesta del Presidente de la Comisión sobre la Carta de Derechos se encaminó claramente a intentar obtener un consenso entre puntos de vista tan encontrados. Su Proposición, la Núm. 272, disponía:

"Sec. 12. Se reconoce el derecho de todo trabajador a escoger su ocupación libremente y a renunciar a ella. . . . Los trabajadores en empresas particulares o en empresas de carácter particular explotadas por el Gobierno, sus corporaciones o agencias, tendrán derecho a organizarse, a llevar a cabo convenios colectivos a través de representantes de su propia selección y determinar por acuerdo con sus patronos las condiciones de su empleo. Los empleados públicos tendrán derecho a formular a través de representantes de su propia selección y ante las autoridades correspondientes, recomendaciones o agravios relativos a su trabajo.

"Sec. 13. La enumeración de derechos que antecede no se entenderá en forma restrictiva ni supone la exclusión de otros derechos pertenecientes al pueblo en una democracia y no mencionados específicamente. Las disposiciones de esta Constitución no se interpretarán en forma que tiendan a restringir la facultad del pueblo para promulgar leyes en protección de la vida, la salud y la seguridad del pueblo de Puerto Rico."

No se produjo el consenso totalmente sobre esta base. Hubo que hacer a todas luces referencia específica, aunque parcial, al derecho a la huelga. La Comisión recomendó a tal fin que la Constitución afirmase que ". . . En sus relaciones con sus propios patronos los trabajadores de empresas y negocios privados y de agencias o instrumentalidades del Gobierno que operen como empresas o negocios privados, tendrán el derecho a organizarse, a ir a la huelga, a establecer piquetes y a efectuar otras actividades concertadas legales para negociar colectivamente a través de representantes de su propia selección y para hacer cumplir sus convenios." 4 *Diario de Sesiones de la Convención Constituyente* 2573. El informe no incluía entonces el segundo párrafo de la actual Sec. 18 del Art. II, pero retenía la sección 13, antes citada, de la referida Proposición Núm. 272, encaminada a proteger la salud y la seguridad del pueblo de Puerto Rico en todo caso.

De este modo fue que se sentaron las bases para obtener la conformidad de los defensores de posiciones tan disímiles como los que abogaban de una parte por el reconocimiento

incondicional del derecho a la huelga de todos los trabajadores, privados y públicos, y los que preferían la omisión de toda referencia al tema en la Constitución o la consignación, a lo más, del derecho de los trabajadores públicos a elevar quejas y agravios al gobierno. Las claves del acuerdo fueron cuatro, a la luz del récord: se abstuvo la Asamblea Constituyente de consagrar el derecho a la huelga de los trabajadores en el sector público, dejándose este asunto al arbitrio de la Asamblea Legislativa, sujeto a determinadas limitaciones constitucionales que afectan la acción de ésta; se reconoció el derecho a la huelga de "los trabajadores de empresas, negocios y patronos privados y de agencias o instrumentalidades del gobierno que funcionen como empresas o negocios privados"; dicho reconocimiento fue cabal, a un grado no alcanzado en la legislación de entonces, supeditándose tan solo, como se diría en el segundo párrafo de la Sec. 18, a "la facultad de la Asamblea Legislativa de aprobar leyes para casos de grave emergencia cuando estén claramente en peligro la salud o la seguridad públicas, o los servicios públicos esenciales"; y, por último, mediante dicho mismo lenguaje, se le extendió sensatamente a la sociedad la protección necesaria contra huelgas que afectasen los intereses comunales básicos.

Es incorrecto, por tanto, estimar que el propósito de la Sec. 18 fue simplemente consagrar los derechos de los trabajadores, vigentes al momento de aprobarse la Constitución. Su historial, como hemos visto, apunta a una conclusión distinta. Para armonizar los puntos de vista en conflicto existentes en aquella época hubo que lograr una base de acuerdo diferente. Se presume, en adición, que las constituciones se aprueban para perdurar, para responder a realidades cambiantes y no para perpetuar meramente el *status quo*. Las constituciones, distinto a las fotografías, no apresan un instante en el tiempo. Véanse: Fernández, Demetrio, *El Ordenamiento y la Problemática de la Negociación Colectiva*

*en el Sector Público,* 42 Rev. Jur. U.P.R. 7, 15–16 (1973); Markus, Richard W., *La Negociación Colectiva en las Corporaciones Públicas y el Fondo del Seguro del Estado,* mimeo, 1974, págs. 18, 22.

## II

Examinemos ahora los criterios para determinar qué es una instrumentalidad del gobierno que funciona como una empresa o negocio privado, dentro del sentido de estos términos en la Sec. 18 del Art. II de nuestra Constitución, y las circunstancias en que opera el párrafo *in fine* de dicha sección. Resulta de lo discutido en la primera parte de esta opinión que la Ley de Relaciones del Trabajo de Puerto Rico, Ley Núm. 130 de 8 de mayo de 1945, según enmendada, no ofrece los verdaderos criterios para resolver la cuestión. [3] Esta legislación es de indudable interés para esta investigación, ya que la semántica de la Sec. 18 deriva de ella, pero no es decisiva, pues su contenido se forja, como hemos visto, al calor del choque de otros intereses en juego. Aun así, valga recordar que en la definición de "instrumentalidades corporativas" que se produce originalmente en el Art. 2 (13) de la Ley Núm. 130 se mencionó específicamente al entonces Servicio de Acueductos y Alcantarillados, junto a la Autoridad de Fuentes Fluviales y "empresas similares que se establezcan en el futuro." Hubo cambios posteriores en la ley [4] y aun se eliminó en 1946 la referencia a Acueductos, por la posibilidad de su ingreso posterior al Servicio por Oposición, pero se incluyó entre las "instrumentalidades corporativas" a "aquellas otras agencias del Gobierno que se dedican o pueden dedicarse en el futuro a negocios lucrativos o a actividades que tengan por objeto un beneficio pecuniario." 29 L.P.R.A.

[3] Para un estudio a fondo de esta legislación, véase: Fernández, Demetrio, *La Junta de Relaciones del Trabajo de Puerto Rico,* mimeo., 1974, pág. 38 y ss.

[4] Véase la Ley Núm. 6 de 7 de marzo de 1946.

sec. 63 (11). Este término fue objeto de interpretación por este Tribunal dos años antes de aprobarse la Constitución de Puerto Rico. En *Junta Rel. Trabajo* v. *Junta del Muelle*, 71 D.P.R. 154, 159 (1950) (Snyder), se afirmó:

"Debe recordarse que en el artículo 2(11) la Legislatura empleó los términos 'negocio lucrativo' y 'beneficio pecuniario' en un sentido especial. Obviamente, no quiso decir que las ganancias debían redundar en beneficio personal de alguien. . . . Más bien creemos que la Legislatura quiso distinguir entre los servicios tradicionales que se prestan al público por el gobierno, tales como sanidad, policía, bomberos, o escuelas, donde los beneficiarios pagan poco o nada, en contraste con servicios tales como transportación, electricidad y *acueductos* donde el consumidor está supuesto a pagar sustancialmente lo que vale el servicio, no obstante ser de naturaleza pública." (Bastardillas nuestras.)

Aun de sostenerse, por tanto, equivocadamente, que nuestra Constitución es enteramente estática e inmune al cambio social, es inescapable la conclusión que la Sec. 18 ampara a los trabajadores de la Autoridad de Acueductos. Recuérdese, además, que en los debates que ocurren en la Convención Constituyente se menciona específicamente a la Autoridad de Acueductos como ejemplo de una agencia que funcionaba como una empresa privada. 3 *Diario de Sesiones de la Convención Constituyente* 1612.

La labor a que nos enfrentamos, sin embargo, es más compleja. La Asamblea Constituyente no se limitó en la Sec. 18 a elevar a rango constitucional un estado de ley existente, a momificarlo y encomendarle regir por décadas, con su terminología y objetivos antiguos, este dinámico campo. Examinemos los debates.

Los debates sobre este particular deben estudiarse a la luz de la experiencia relativamente corta de Puerto Rico y Estados Unidos en atender, para el tiempo en que se aprueba la Constitución del Estado Libre Asociado, los complicados problemas que plantea la negociación colectiva en el sector

público. Aunque en Puerto Rico se da desde antes—ocurren huelgas en el sector público desde 1945 (⁵)—el primer paso significativo en Estados Unidos en el campo de la negociación colectiva pública ocurre en 1954. Sullivan, D. P., *Public Employee Law*, Cincinnati, 1969, sec. 15.1. En 1958 hubo tan solo en todo Estados Unidos quince huelgas en el sector público, que envolvieron a 1,720 empleados. Es desde dicha fecha que comienza a ampliarse significativamente el número e importancia de las huelgas en Estados Unidos hasta alcanzar grandes proporciones en esta década. Smith, Edwards and Clark, Jr., *Labor Relations Law in the Public Sector*, The Bobbs-Merrill Co., Inc., 1974, págs. 655–656. Para la comparación entre Estados Unidos y Puerto Rico, véase el *Informe de la Comisión del Gobernador para Estudiar Relaciones del Trabajo en el Servicio Público en Puerto Rico* ("el Informe Helfeld"), 1975, vol. 1, págs. 26–27. La literatura sobre estos temas era también muy escasa. Es irrazonable por tales motivos requerirle a la discusión habida la exposición de los términos utilizados con tal claridad que permitiese sin dificultades la solución de la multitud de problemas de interpretación que pudiesen surgir en el futuro. Las constituciones, como los ríos, son siempre las mismas y siempre cambian. Las constituciones de envase cerrado, las excesivamente pormenorizantes, las de términos inflexibles y rígidos, rara vez perduran.

La conclusión central que se deriva del estudio cuidadoso de los debates sobre la Sec. 18 es que no existe un solo criterio para determinar cuándo una agencia o instrumentalidad del gobierno funciona o no como una empresa o negocio privado y goza o no en consecuencia del derecho a la huelga.

Algunos delegados entendían, por ejemplo, que el dato significativo es si los empleados de la agencia concernida per-

---

(⁵) Galvin, Miles E., *Collective Bargaining in the Public Sector in Puerto Rico*, tesis doctoral en maquinilla, s. f., Univ. de Wisconsin, pág. 342 y ss.

tenecen o no al servicio civil. 3 *Diario de Sesiones de la Convención Constituyente* 1612 y ss. El presidente de la Comisión de Derechos Civiles corrigió esta impresión, afirmando: ". . . En primer lugar el que estén gobernados por un sistema de servicio civil es uno de los indicios significativos, básicos de si o no están funcionando fuera del ámbito de empresas privadas. . . ." *Ibid.*, 1615. Luego reiteró: ". . . Lo que se está estableciendo es no meramente que [basta] con entrar en el servicio civil sino que el servicio civil es uno de los ingredientes importantísimos en la calibración de qué es la situación que se produce. . . ." *Ibid.*, 1616.

Otro criterio formulado fue si por cuestión de la naturaleza intrínseca de los servicios envueltos éstos nunca han sido prestados por la empresa privada. Expresó el Lic. Gutiérrez Franqui, en diálogo con el Lic. Luis Negrón López:

". . . ¿si no podríamos llegar al acuerdo de que esto quiere decir: si una agencia presta servicios de la naturaleza del cuerpo de policía, que por su naturaleza intrínseca, nunca han sido prestados por empresas privadas, si ése fuera la clase de servicio y la naturaleza de la empresa, por esa única razón quedarían fuera del concepto; si por otro lado, si los trabajadores, aunque fuera vendiendo pan, estuvieran trabajando para una empresa del gobierno, y sus empleados recibieren sus condiciones de trabajo y sus salarios por disposición de una ley de servicio civil, también eso solo sería suficiente para sacarle de la categoría? O sea, que tanto cuando la naturaleza intrínseca del servicio los coloca como uno que nunca ha sido objeto de servicio o empresa privada, como cuando los empleados estén sometidos a la disposición de una ley de servicio civil, se entenderá que no es una empresa del gobierno de la naturaleza o funcionando como una empresa privada." *Ibid.*, 1620.

El debate no determinó definitivamente la totalidad de los criterios para precisar el significado de la frase "agencias o instrumentalidades del gobierno que funcionen como empresas o negocios privados." Puede afirmarse que la intención de la Convención Constituyente fue que los dos criterios mencionados deben tomarse en consideración y que ambos

son de vital importancia para la definición de los términos que nos ocupan. El historial de la disposición concernida en modo alguno sostiene la conclusión, sin embargo, que éstos son los únicos factores determinantes del significado de la cláusula constitucional bajo examen. Antes de enumerar otros factores que también deben ser objeto de análisis, aclaremos, no obstante, el rol que juega dentro del plan constitucional la esencialidad o no del servicio a prestarse.

 El récord sobre este particular es absolutamente claro. La esencialidad del servicio no es determinante para resolver si un grupo de trabajadores tiene derecho a la huelga, pero indispensable para determinar las limitaciones que pueden imponérsele a dicho derecho. En la primera parte de esta opinión se esbozan ya las razones para esta conclusión, pero acudamos a los debates. De éstos se desprende prístinamente que el párrafo *in fine* de la Sec. 18 se insertó en la Constitución para proveerle a la comunidad en casos de grave emergencia la necesaria protección a su salud, a la seguridad pública y a los servicios públicos esenciales y no para servir de criterio para el disfrute o no del derecho a la huelga.

El párrafo *in fine* de la Sec. 18 se incluye al final de los debates, después de aprobarse en segunda lectura dicha sección, cuando a varios delegados les asaltaron dudas sobre el efecto de lo realizado hasta entonces. En moción de reconsideración se propuso entonces añadirle el siguiente lenguaje al primer párrafo de la Sec. 18:

"Nada de lo aquí contenido menoscabará el derecho de la Asamblea Legislativa de Puerto Rico de aprobar leyes para casos de emergencia en que se ponga en peligro la salud, la seguridad o el bienestar públicos." 3 *Diario de Sesiones de la Convención Constituyente* 2264.

El portavoz de la mayoría explicó la enmienda, expresando que la Sec. 18, según aprobada en segunda lectura, les extendía el derecho de huelga "sin limitación [a] trabajadores en empresas esencialmente necesarias para la vida de la co-

munidad cuya suspensión sin reglamentación o ilimitada podría perjudicar seriamente la salud del pueblo . . . la salud pública . . . y . . . el bienestar de la comunidad en general. . . ." *Ibid.*, 2266. En vista del delicado balance de fuerzas que representaba la Sec. 18, el referido portavoz tuvo cuidado en aclarar previamente, no obstante, que no se estaba debilitando el reconocimiento del derecho a la huelga consignado en el primer párrafo de la sección. Expresó al efecto:

"El único propósito que persigue la enmienda es aclarar que las disposiciones anteriores sobre el derecho a ir a la huelga, a establecer piquetes y celebrar otras actividades legales concertadas . . . no menoscabarán el derecho que consideramos inherente del Estado . . . de proteger la salud, la seguridad y el bienestar general de los ciudadanos cuando éstos . . . puedan ser puestos en peligro inminente. . . .

". . . esta disposición en forma alguna, podría limitar actividad de huelga o de piquete alguno, por poderoso, por fuerte, por extenso que sea, excepto en el momento en que, según el caso de emergencia fuere determinado por el poder legislativo, pueda la situación convertirse en una amenaza, para la salud, la seguridad o el bienestar del público en general." *Ibid.*, 2265.

La enmienda propuesta preocupó a un grupo de delegados, inquiriendo don Lino Padrón Rivera:

". . . ¿Entiende el compañero que una huelga es una emergencia? . . . ." *Ibid.*, 2266

El portavoz de la mayoría, Lic. Víctor Gutiérrez Franqui, contestó:

"No, no, no, la emergencia, la situación de emergencia es lo que puede surgir como resultado de una huelga y dentro de las normas que para describir una emergencia adopte la Asamblea Legislativa. Una huelga por sí sola, no es una emergencia dentro del sentido de esta enmienda." *Loc. cit.*

Esta explicación a solas no satisfizo al sector dirigido por el Sr. Padrón Rivera, proponiéndose entonces la siguiente enmienda a la enmienda:

"Las disposiciones de esta sección no menoscabarán la autoridad de la Asamblea Legislativa, para dictar leyes para, en caso de *grave* emergencia y cuando estuviesen en *inminente* peligro, proteger la salud, la seguridad y el bienestar público." *Loc. cit.* (Bastardillas nuestras.)

La adición de los términos en bastardillas se estimó insuficiente, sin embargo, por miembros del propio sector mayoritario. Un líder de este sector se manifestó en la siguiente forma:

"Yo tengo la preocupación que tiene el compañero Reyes Delgado, pero a mí no me satisface la palabra inminente. Me parece que debe ser algo más fuerte que inminente.

Me parece que debe ser algo equivalente a lo que la jurisprudencia constitucional norteamericana ha cualificado como *clear and present danger*. No me parece que un daño inminente debe ser suficiente; debe ser un daño efectivo, actual, existente. Creo, además, Sr. Presidente, que el término 'bienestar general' es un término demasiado lato y, además, es una palabra que crece y crece y crece más todos los días. . . ." *Ibid.,* 2267.

Sugirió a continuación el orador que se sustituyese el vocablo "inminente" por "claramente" y que en vez de al "bienestar general" se refiriese a "los servicios públicos esenciales." *Loc. cit.* Esta fue la base de la transacción final y la propuesta que pasó a constituir el párrafo *in fine* de la Sec. 18 del Art. II. Como se ve, dicho párrafo representa el fundamento constitucional específico para brindarle amparo a la comunidad contra huelgas y otras actividades concertadas que creen graves emergencias y pongan en peligro la salud o la seguridad públicas o los servicios públicos esenciales. La esencialidad de un servicio público puede utilizarse para invocar dicho párrafo en los casos a que se refiere, pero no es piedra de toque para decidir qué trabajadores públicos disfrutan o no del derecho a la huelga. Es interesante señalar que hoy día se critica severamente el criterio de la esencialidad del servicio como base para distinguir entre huelgas legítimas e ilegítimas. Smith, Edwards and Clark, Jr., *Labor*

*Relations Law in the Public Sector*, The Bobbs-Merrill Co., Inc., 1974, págs. 685–686. Véase: Howlett, *The Right to Strike in the Public Sector*, 53 Chi. B. Rec. 108 (1971).

■ Los debates, en resumen, aportan dos criterios que pueden considerarse, junto a muchos otros, para resolver cuándo es que una agencia del gobierno funciona como una empresa privada y eliminan uno. Del lenguaje en sí de la Sec. 18, de las circunstancias de su formulación, de su propósito, de su glosa, de las realidades a que sirve y en que opera, pueden derivarse otros criterios. El Informe Helfeld (vol. 1, pág. 21) sugiere acertadamente varios factores que deben tomarse en consideración, entre ellos: si los empleados de la agencia concernida están cubiertos por la Ley de Personal del Estado Libre Asociado; si los servicios prestados por la agencia, por su naturaleza intrínseca, nunca han sido prestados por la empresa privada; si la agencia está capacitada para funcionar como una empresa o negocio privado; si la agencia de hecho funciona como una empresa o negocio privado; el grado de autonomía fiscal de que disfrute la agencia; el grado de autonomía administrativa de que goce; si se cobra o no un precio o tarifas por el servicio rendido (precio que debe ser básicamente equivalente al valor del servicio); si los poderes y facultades concedidos en la ley orgánica de la agencia la asemejan fundamentalmente a una empresa privada; y si la agencia tiene o no la capacidad para dedicarse en el futuro a negocios lucrativos o a actividades que tengan por objeto un beneficio pecuniario. A estos criterios pueden añadirse otros, sin pretender agotar la lista: la estructura en sí de la entidad; la facultad de la agencia para demandar y ser demandada ilimitadamente; el poder de obtener fondos propios en el mercado general de valores a base de su récord económico y sin empeñar el crédito del Estado Libre Asociado; la facultad de adquirir y administrar propiedades sin la intervención del Estado; el punto hasta donde el reconocimiento a los trabajadores de la agencia de los derechos a que

se refiere el primer párrafo de la Sec. 18 concuerda o no con el esquema constitucional.

Ningún criterio es determinante por sí solo del problema que nos ocupa. Debemos examinar en cada caso la conjunción de factores existentes para a su luz resolver si la agencia concernida funciona o no como un negocio privado en el sentido constitucional. Es esta cuestión la que debemos analizar ahora.

## III

Los empleados de la Autoridad de Acueductos y Alcantarillados no pertenecen desde 1961 a la Ley de Personal del Estado Libre Asociado. La agencia goza de extraordinaria autonomía fiscal y administrativa. Su estructura, así como sus poderes y facultades, la asemejan fundamentalmente a una empresa privada. La Autoridad es "un cuerpo corporativo . . . una corporación pública e instrumentalidad gubernamental autónoma del Estado Libre Asociado. . . ." 22 L.P.R.A. sec. 142. Posee una estructura análoga a la de una corporación privada, con su Junta de Gobierno y su personal ejecutivo responsable a la Junta. 22 L.P.R.A. sec. 143. Goza de sucesión perpetua. Puede demandar y ser demandada, aunque con ciertas restricciones, pero no tan amplias como las que protegen al Estado. Puede contratar libremente; adquirir y disponer de bienes raíces; "tener completo dominio de sus propiedades y actividades"; "tomar dinero a préstamo y emitir bonos de renta para cualesquiera de sus fines corporativos. . . ." Los bonos y otra evidencia de deuda que emite la Autoridad no empeñan el crédito o el poder de imponer tributos del Estado Libre Asociado. 22 L.P.R.A. sec. 144. La Autoridad cobra por los servicios que rinde y, como se trata de bonos de renta, debe cobrar sustancialmente lo que éstos valen para permitir, como en el caso de un financiamiento privado análogo, la amortización adecuada de la deuda. 22 L.P.R.A. secs. 144 (i) y 152. La Autoridad puede incuestiona-

blemente dedicarse a actividades que tengan por objeto "un beneficio pecuniario", dentro del significado de esta frase según nuestra decisión en *Junta Rel. Trabajo* v. *Junta del Muelle*, supra. La Autoridad de Acueductos y Alcantarillados está indudablemente capacitada como una empresa o negocio privado y de hecho funciona como tal.

Del otro lado puede afirmarse que los servicios que rinde la Autoridad se han prestado normalmente por el Estado en Puerto Rico. Hubo una pequeña excepción y es discutible si su prestación por una agencia del Estado se debe más a nuestras circunstancias históricas que a la naturaleza intrínseca del negocio—véase la situación contraria prevaleciente en algunas otras jurisdicciones: *N.L.R.B.* v. *El Dorado Water Co.*, 195 F.2d 950 (6th Cir. 1952) y *Twin Falls Canal Company*, 29 L.R.M.M. 1277 (1952)—pero aun bajo la hipótesis de que se debiese a la naturaleza intrínseca del negocio y de que no se hubiese conocido excepción a la prestación gubernamental de este servicio en nuestro medio, este criterio no basta de por sí para anular la impresionante combinación de factores que apunta a la conclusión de que la Autoridad de Acueductos funciona como una empresa o negocio privado dentro del significado de la Sec. 18. Aunque no se trata en estos casos de un mero contaje mecánico de factores y hay algunos a los que deberá asignárseles mayor importancia que a otros, la balanza en esta ocasión se inclina demasiado pesadamente a favor de la conclusión de que la Sec. 18 ampara a los trabajadores de la Autoridad de Acueductos y Alcantarillados y les reconoce el derecho a la huelga, bajo las limitaciones que en dicha disposición se establecen.

## IV

Procede a continuación determinar si la Ley Núm. 142 de 30 de junio de 1961, 29 L.P.R.A. sec. 481 y ss., es constitucional. Su Art. 16, 29 L.P.R.A. sec. 496, prohíbe *a priori* la huelga, haya o no surgido una grave emergencia que ponga

en claro peligro la salud o la seguridad públicas o los servicios públicos esenciales. La Ley se aplica únicamente, además, a los empleados de la Autoridad de Acueductos y Alcantarillados y de la Autoridad de Comunicaciones. Markus, *La Negociación Colectiva en las Corporaciones Públicas y el Fondo del Seguro del Estado*, mimeo. 1974, pág. 126 y ss.

 La prohibición absoluta de la huelga que contiene la Ley Núm. 142 se funda en la premisa que los empleados a que se refiere no poseen el derecho a la huelga bajo las disposiciones del primer párrafo de la Sec. 18 del Art. II de la Constitución del Estado Libre Asociado. Según se demuestra en las partes anteriores de esta opinión, tal premisa es incorrecta respecto a los empleados de la Autoridad de Acueductos. [6] El derecho a la huelga de los trabajadores de negocios privados o de agencias del gobierno que funcionen como negocios privados no está sujeto a prohibición previa e incondicional bajo las disposiciones de nuestra Constitución. A lo que está sujeto es a amplísima reglamentación—tan amplia como lo requiera el interés público—en "casos de grave emergencia cuando estén claramente en peligro la salud o la seguridad públicas, o los servicios públicos esenciales." La Ley Núm. 142 se redactó simplemente sobre una base teórica errónea y esto basta para viciarla de inconstitucionalidad en su aplicación a este caso, sin que tengamos que considerar los serios problemas de igual protección de las leyes que suscita la negación del derecho a la huelga a los trabajadores de la Autoridad de Acueductos y su reconocimiento a los trabajadores de otras agencias del gobierno de estructura y características análogas.

La determinación que hacemos sobre la anticonstitucionalidad de la Ley Núm. 142 no le niega en modo alguno al pueblo de Puerto Rico los recursos a que tiene derecho bajo

---

[6] No nos toca expresarnos aquí sobre la situación de los empleados de la Autoridad de Comunicaciones bajo esta ley.

el segundo párrafo de la Sec. 18 del Art. II de la Constitución para protegerse contra huelgas paralizantes de los servicios públicos esenciales. Dicha protección es enteramente alcanzable, pero por los caminos que la Constitución permite, que son anchos. Lo sucedido con la Ley Núm. 142 fue simplemente que representa la ruta equivocada. Contrasta dramáticamente en este sentido la filosofía de la Ley Núm. 142 con la de la Núm. 11 de 22 de mayo de 1965. Esta última ley se aprobó específicamente, según se expresa en su Exposición de Motivos, "para dar efectividad a la facultad constitucional que tiene la Asamblea Legislativa de aprobar leyes para casos de grave emergencia, cuando estén claramente en peligro la salud o seguridad públicas, o los servicios públicos esenciales según prevé la Sec. 18 de la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico." La Ley de *Injunction* General, la Núm. 50 de 4 de agosto de 1947, 29 L.P.R.A. sec. 101 *et seq.*, ofrece otra ruta. El párrafo *in fine* de la Sec. 18 de tal Art. II de la Constitución permite, en adición, otros medios para la debida protección del interés público.

Nuestra Constitución permite, por tanto, lograr un justo equilibrio entre los intereses de la comunidad y los de los trabajadores. Se protege el derecho a la huelga, pero este derecho no puede esgrimirse para crear situaciones de emergencia que amenacen gravemente la salud, la seguridad o los servicios esenciales de este pueblo.

La determinación de que la Ley Núm. 142 es anticonstitucional tampoco resuelve necesariamente este pleito en su fondo, ya que toda revisión se da contra la sentencia y no contra sus fundamentos. Nos toca, por tanto, examinar por último la validez del *injunction* dictado.

## V

El auto de *injunction* expedido contra la unión recurrente fue a nuestro juicio emitido debidamente por con-

currir en este caso los requisitos dispuestos en el Art. 5 de la Ley Núm. 50 de 4 de agosto de 1947 (29 L.P.R.A. sec. 101 *et seq.*). La violencia o el sabotaje como arma de coacción directa o indirecta de cualquier sector en una disputa obrero patronal no tiene cabida en nuestra sociedad por confligir con el principio básico de convivencia social pacífica que presupone el ejercicio de cualquier derecho bajo nuestra Constitución. Cuando la naturaleza, magnitud e intensidad del conflicto cobra las dimensiones que distinguió el caso de autos, los tribunales no pueden hacer abstracción de tal realidad y adoptar pronunciamientos y posiciones que destruyan las aspiraciones legítimas de un pueblo que adoptó como norma de excelencia el reconocer y proveer en todo conflicto un equilibrio moderador y justiciero entre los derechos legítimos y razonables de cualesquiera de sus miembros, ya sea actuando en su carácter individual o concertadamente y los justos reclamos de seguridad, paz y salud del propio pueblo que reconoce y protege los derechos de sus integrantes. *Cf. El Imparcial, Inc.* v. *Brotherhood, etc.*, 82 D.P.R. 164 (1961).

*Se confirmará en consecuencia la resolución dictada.*

El Juez Asociado Señor Rigau concurre con el resultado de la opinión del Tribunal en tanto en cuanto éste decide que las resoluciones recurridas deben sostenerse. El Juez Rigau radicará un voto separado.

—O—

Opinión disidente en parte del Juez Asociado Señor Rigau.

San Juan, Puerto Rico, a 20 de enero de 1977

Con el debido respeto para otros criterios, paso a exponer el mío. Este es un caso de considerable interés público porque sus consecuencias trascienden los hechos específicos que lo motivaron. Creo que tiene que ver con mucho más que si una ley en particular es constitucional o no. Creo que tiene que ver con los fines o propósitos para los cuales existe el Estado,

con si es posible la vida pacífica y civilizada del hombre moderno en las grandes ciudades y con lo que la Constitución de Puerto Rico tiene que decir sobre el particular.

Por eso estimo que en la consideración del mismo debe irse a la médula del asunto. Para ello es necesario que nos dirijamos a ciertos conceptos fundamentales comprendidos en la letra y en el espíritu de nuestra Constitución.

El arte de gobernar, además de consistir de dirigir, educar y administrar, consiste en gran medida en el ajuste ponderado de intereses en conflicto. Más adelante examinaremos y compararemos los intereses en conflicto en este caso.

Se gobierna—en los países en que como el nuestro tienen el tipo de gobierno presidencial y de separación de poderes— desde las Casas de Gobierno, desde los Cuerpos Legislativos y, en apreciable medida, también desde los Tribunales Supremos. [1] Precisamente un ejemplo de esto último lo constituye

[1] Desde luego, la función de gobernar corresponde primordialmente al Ejecutivo y al Legislativo. La función de los Tribunales Supremos es mayormente judicial pero su contribución o su intervención—según se vea —en la política pública es a veces notable. Recuérdese, por ejemplo, la controversia del Tribunal Supremo de los Estados Unidos con el gobierno del Presidente Franklin D. Roosevelt sobre medidas de reforma económica y social. Los estudiosos de la función judicial reconocen y discuten la participación ocasional pero importante de los Tribunales Supremos en la formulación de la política pública. Cox, *The Role of the Supreme Court in American Government* (1976); Robert H. Jackson, *The Supreme Court in the American System of Government* (1955); Goldberg, *Equal Justice* (1971); Schwartz, *The Reins of Power* (1963); Rostow, *The Sovereign Prerogative* (1962); Bickel, *The Least Dangerous Branch* (1962); Shapiro, *Law and Politics in the Supreme Court* (1964); McCloskey, *The American Supreme Court* (1960); Black, *A Constitutional Faith* (1968); Berle, *The Three Faces of Power* (1967); Pritchett, *The Roosevelt Court* (1948); Berger, *Congress v. The Supreme Court* (1969); R. H. Jackson, *The Struggle for Judicial Supremacy* (1941); Schwartz, *The Supreme Court* (1957); Corwin, *American Constitutional History* (1964); Freund, *The Supreme Court of the United States* (1949); Benjamin F. Wright, *The Growth of American Constitutional Law* (1942); Levy, ed., *Judicial Review and the Supreme Court* (1967); Becker & Feeley, ed., *The Impact of Supreme Court Decisions* (1973); Pfeffer, *This Honorable Court* (1965); Mason, *The Supreme Court From Taft to Warren* (1958); Thayer, *The Origin and Scope of the American Doctrine of Constitutional Law*, 7 Har. L. Rev. 129 (1893).

la opinión mayoritaria en este caso, mediante la cual se le niega a la Asamblea Legislativa de Puerto Rico la facultad de legislar que expresamente le confiere la segunda oración de la Sec. 18 del Art. II de la Constitución.

Veamos lo que dice la Constitución sobre el asunto que nos ocupa. La Sec. 18 del Art. II—que es la sección clave en este caso—consta de dos oraciones. Tal parece que se le ha dado mucha importancia a la primera de esas dos oraciones y muy poca o ninguna a la segunda. Como trataré de demostrar, hay que prestarle igual atención a ambas. Dice *verbatim* dicha Sec. 18:

"A fin de asegurar el derecho a organizarse y a negociar colectivamente, los trabajadores de empresas, negocios y patronos privados y de agencias o instrumentalidades del gobierno que funcionen como empresas o negocios privados tendrán, en sus relaciones directas con sus propios patronos, el derecho a la huelga, a establecer piquetes y a llevar a cabo otras actividades concertadas legales.

*Nada* de lo contenido en esta sección menoscabará la facultad de la Asamblea Legislativa de aprobar leyes para casos de grave emergencia cuando estén claramente en peligro la salud o la seguridad públicas, o los servicios públicos esenciales." (Bastardillas nuestras.)

Salta a la vista del propio texto constitucional que el derecho a la huelga que dicha sección confiere a los empleados de agencias públicas no es un derecho absoluto. No puede serlo. Está limitado por realidades tales como las "graves emergencias" que ponen en peligro "la salud o la seguridad pública" o "los servicios públicos esenciales." Limitaciones indispensables éstas. Más adelante volveremos sobre esto.

Examinemos, aunque sea en términos generales, los hechos del caso, pues se trata de una opinión judicial sobre un caso concreto y no de un ejercicio académico formulado en el vacío. Como los hechos no fueron controvertidos la expresión que de los mismos nos llega a través de los autos

es lacónica, pero si se absorben con cuidado pueden dar una idea de su significado y de su impacto.

La Autoridad de Acueductos y Alcantarillados es un organismo público del pueblo de Puerto Rico cuya función es recoger, tratar y servir agua potable a tres millones de habitantes de este país para sus infinitos usos en el hogar, los hospitales, la escuela, el comercio, la industria y un sinnúmero de otros usos públicos y privados.

La Unión demandada declaró una huelga contra la Autoridad de Acueductos en octubre de 1974. Los empleados huelguistas incluían los de oficina, los de campo y operación y los de mantenimiento de los sistemas de acueductos y de alcantarillados sanitarios en todo el país.

Los empleados de operación y mantenimiento son responsables del funcionamiento de las 48 plantas de filtración que tiene la Autoridad en la Isla y en las cuales se trata el agua para consumo humano. Dichos empleados son también necesarios para el funcionamiento de las 91 plantas de tratamiento de aguas negras. También son necesarios para la operación de las bombas utilizadas para la distribución del agua potable y para la operación de las bombas que disponen de las aguas negras.

El costo de las mencionadas 48 plantas de filtración fluctúa entre $1,000,000 y $10,000,000 cada una, a precios de antes, y el de las 91 plantas de tratamiento de aguas negras es de aproximadamente $5,000,000 cada una. Si esas plantas, las de filtración así como las de tratamiento, no se atienden adecuadamente se deterioran y sufren daños cuantiosísimos. También su falta de atención afecta inmediatamente la calidad del agua, poniendo así en peligro real y efectivamente la salud pública.

Además de las muchas consecuencias desastrosas directas que puede producir en el país la falta de agua potable se producen también muchas y graves consecuencias indirectas. Para dar un solo ejemplo: la Autoridad de Acueductos suple

a la Autoridad de las Fuentes Fluviales grandes cantidades de aguas limpias que ésta necesita para la generación de vapor en sus plantas termoeléctricas de Palo Seco y Puerto Nuevo, las cuales generan un alto porciento de la energía eléctrica que se consume en Puerto Rico. La falta de agua puede paralizar esas plantas generadoras en cuestión de horas.

La resolución del Tribunal Superior menciona también otros perjuicios que se deducen de la paralización de las operaciones de la Autoridad de Acueductos. Al no haber agua no pueden controlarse los incendios poniéndose así en peligro vidas y propiedades. Si no se tratan las aguas negras se pueden producir epidemias. Cuando cesa el abastecimiento de agua en una gran ciudad, como lo es el Area Metropolitana de San Juan con su millón de habitantes, se crean serios problemas sanitarios en los hogares, restaurantes, hoteles, hospitales y escuelas y se paralizan industrias y negocios.

Este caso que nos ocupa fue notorio por la destrucción de propiedad y tuberías de la Autoridad de Acueductos, lo cual dejó sin agua a varios sectores del Area Metropolitana de San Juan. El tribunal de instancia concluyó que "desde que se decretó la huelga ha estado ocurriendo una incidencia extraordinaria de averías anormales efectuadas sobre tuberías de conducto de agua y otras propiedades de la parte demandante que consideramos de naturaleza maliciosa." Ese eufemismo lo que quiere decir es sabotaje.

El Estado es la organización con que cuenta la sociedad para llevar a cabo unos fines públicos que no pueden ser realizados por las personas particulares. Mantener el orden para hacer posible la vida en sociedad y para propiciar el desarrollo físico, intelectual y moral de los seres humanos es el propósito primordial del Estado. Prácticamente todos los pensadores que se han ocupado de la naturaleza y de los fines del

Estado, desde Aristóteles hasta nuestros días, así lo han reconocido. [2]

La existencia del orden es requisito indispensable y básico de toda sociedad humana. Hay otros propósitos deseables que incumbe a los Estados llevar a cabo pero la realización de ninguno de ellos es posible si no existe un orden razonable en la sociedad. Tan indispensable es una medida razonable de orden público y de seguridad personal, que es un hecho histórico que los pueblos han preferido tolerar a un gobernante absoluto a sufrir la anarquía, el desorden y la inseguridad colectiva o individual.

Desde luego, como hemos dicho antes, no favorecemos ni el orden sin libertad ni la libertad sin orden. [3] Favorecemos la libertad ejercida dentro del marco de las leyes y de la Constitución, que después de todo es la única libertad posible en las sociedades humanas. Igualmente favorecemos un gobierno que de igual manera opere dentro de la ley y la Constitución.

Expuestos los hechos y las anteriores premisas generales que sirven de marco a este caso, veamos ahora concrétamente los intereses en conflicto en el mismo. De una parte está la Unión demandada, la cual consta de aproximadamente 2900 miembros. De la otra parte están los tres millones de habitantes de Puerto Rico para los cuales es indispensable el agua potable que produce la Autoridad de Acueductos.

[2] Aristóteles, *Política;* Santo Tomas De Aquino, *Summa Theologica;* Hobbes, *Leviathan;* Locke, *Gobierno Civil;* Montesquieu, *Espíritu de las Leyes;* Rousseau, *Contrato Social;* Kant, *Ciencia del Derecho;* Hegel, *Filosofía del Derecho;* MacIver, *The Modern State* (1926) ; A. D. Lindsay, *The Modern Democratic State* (1943) ; Ernest Barker, *Principles of Social and Political Theory* (1951).

[3] "La Democracia como Forma de Vida y como Sistema de Gobierno," conferencia auspiciada por el Departamento de Instrucción del Gobierno de Puerto Rico, dictada por el Canal 6, TV en octubre de 1971; "¿El Imperio de qué Ley?", discurso pronunciado en el Colegio de Abogados de Puerto Rico con motivo del Día de la Ley, en 1ro. de mayo de 1968.

Si se tiene en cuenta que una decisión de ir o no a la huelga, con los resultados antes dichos, se toma con frecuencia en una asamblea a la cual concurren dos o tres centenares de empleados resulta más visible la falta de proporción y de balance entre el poder de ese reducido número de personas— que no son representantes electos de la población—y los tres millones de seres humanos que sufren las consecuencias.

Una Constitución democrática como la que interpretamos, que declara que el sistema democrático es fundamental para la vida de la comunidad puertorriqueña; que entiende que dicho sistema es aquel donde la fuente del poder es la voluntad del pueblo; que considera como factor determinante en nuestra vida la fidelidad a los valores morales del ser humano por encima de los intereses económicos, (⁴) difícilmente puede tener como propósito que una asamblea no electa como la antes mencionada pueda ejercer tan gran poder en forma absoluta sobre todo el país.

Ante la realidad de los graves perjuicios que ocasiona dejar al país sin agua potable y del reducido número de personas que podría tomar esa decisión, no es sorprendente que el derecho a la huelga que confiere la antes citada Sec. 18 no sea absoluto. La propia Comisión de la Carta de Derechos de la Convención Constituyente, al discutir en su Informe el derecho a la huelga se expresó como sigue:

"Ciertamente no se ha pretendido reclamar y menos establecer el derecho a la huelga sin límite o sin reglamentación. En primer término, el derecho constitucional aquí fijado no se extiende ni a huelgas de simpatía ni a actividades concertadas de carácter ilegal ni a actuaciones en violación de los convenios. . . .

En la teoría democrática el conflicto obrero-patronal no es un desiderátum. El desiderátum es la armonía, la cooperación, la más abundante producción como resultado de la justicia social. Dentro de los principios de la convivencia democrática el conflicto obrero-patronal, cuando surge, es un problema so-

---

(⁴) Preámbulo de la Constitución de Puerto Rico.

cial que a todos: obreros, patronos y público, perjudica; y que a todos: obreros, patronos y público, urge resolver. . . ." (5)

Aunque el derecho a la huelga es sin duda un valor muy importante en nuestra moderna sociedad industrial forzoso es reconocer que hay otros valores más importantes que ese. La industria y los sindicatos existen para el servicio del hombre y no a la inversa. La vida buena, social, humanizada y pacífica y la tranquilidad espiritual que dicha vida puede producir es un valor superior al derecho a la huelga, no empece lo importante y necesario que a veces puede ser este último derecho mencionado.

En cuanto a la ley específica que se cuestiona en este caso, la Ley Núm. 142 de 30 de junio de 1961, 29 L.P.R.A. sec. 481 y ss., no creo que plantea problema de igual protección de las leyes por el hecho de que se haya atendido en primer lugar el problema de Acueductos y no los demás posibles problemas huelgarios de otras agencias públicas. En materia de igual protección de las leyes el Poder Legislativo no viene obligado a dirigirse a todos los problemas públicos a la vez—lo cual además sería imposible—sino que puede dirigirse a unos primero y a otros después. La prioridad en atender a unos u otros es una cuestión de política pública que corresponde a la Asamblea Legislativa decidir. (6) No puede dudarse de que el abastecimiento de agua potable a un país urbano, industrial y sobrepoblado como el nuestro tiene una primerísima prioridad.

Unas palabras sobre los factores que usualmente se ofrecen como criterios para determinar si un organismo público

---

(5) 4 *Diario de Sesiones de la Convención Constituyente de Puerto Rico,* 2575 (ed. 1961).

(6) *Hughes* v. *Alexandria Scrap Corp.,* res. en 24 Junio 1976, 44 U.S. L.W. 4959; *City of New Orleans* v. *Dukes,* res. en 25 Junio 1976, 44 U.S. L.W. 5074; *Katzenbach* v. *Morgan,* 384 U.S. 641, 657 (1966); *Williamson* v. *Lee Optical, Inc.,* 384 U.S. 483, 488 (1955); *West Coast Hotel Co.* v. *Parrish,* 300 U.S. 379, 400 (1937); y *Wackenhut Corp.* v. *Rodríguez Aponte,* 100 D.P.R. 518, 531 (1972).

funciona como tal o como una empresa privada. Se mencionan, entre otros, los siguientes: si dicho organismo o agencia pública puede tomar dinero a préstamo o no; si tiene autonomía administrativa; si puede demandar y ser demandado; si tiene fondos propios separados de los del Fondo General; si puede comprar, administrar y vender propiedades; si su estructura legal (generalmente de tipo corporativo) y sus poderes se asemejan a los de las empresas privadas; si está exenta por ley de ciertos controles tradicionales tales como Ley de Personal, Negociado del Presupuesto y Departamento de Hacienda, aunque tengan los controles internos suyos propios—tesorero, contralor, Junta de Directores, etc.

La realidad es que casi todas esas características se le confirieron a las agencias y corporaciones públicas, aquí y fuera de Puerto Rico, para darles flexibilidad de operación. Fueron medidas de conveniencia práctica para habilitar a esas agencias para que pudiesen trabajar rápida y eficazmente sobre los problemas sociales y económicos que planteó la gran crisis económica de los años 30. [7] También la forma corporativa pública hacía posible tomar dinero prestado ("emisión de bonos") para fines públicos, suplementando así el entonces escaso Fondo General. [8] Se trataba y se trata de servicio público en el amplio sentido de la frase. Al comienzo de la administración del Presidente Franklin D. Roosevelt se creó un número de esas agencias en los Estados Unidos y lo mismo se hizo en Puerto Rico en los años cuarenta.

Para concluir si se trata de un servicio público o no, no

---

[7] Whatkins, *Federal Ownership of Corporations*, 26 Geo. L.J. 261, 285; Field, *Government Corporations*, 48 Harv. L. Rev. 775, 776; Stocke, *Some Aspects of the Legal Status of Federal Corporations*, 27 Geo. L.J. 1, 4.

[8] Wells, *The Modernization of Puerto Rico*, pág. 166 (1969). Trad. española, *La Modernización de Puerto Rico*, pág. 171 (1972); Goodsell, *Administration of a Revolution*, pág. 162 y ss. (1965). V. también los trabajos citados en el escolio 7.

son las fórmulas antes mencionadas las determinanteṣ. Esas, como vimos, son fórmulas de táctica. Lo realmente importante es el propósito para el cual existe y funciona la agencia y quien la posee. ¿La posee el público o unos dueños privados? ¿Opera con fines de lucro, como los negocios privados, o con fines de servicio público? Demás está decir que las agencias públicas, incluyendo las que suplen servicios esenciales como los de agua, fuerza eléctrica y otros, no operan, ni deben operar, con fines de lucro sino para dar un servicio público eficiente al menor costo posible.

Deseo añadir que no podemos interpretar la Constitución únicamente a base de unos debates que tuvieron lugar antes de que la Constitución naciera. Ya hay un cuarto de siglo de experiencia bajo la Constitución y esa experiencia vale tanto o más que las escaramuzas verbales preconstitucionales.

Una última preocupación mía sobre este caso. Es de conocimiento general en el campo del derecho, que los Tribunales no declaran leyes inconstitucionales a menos que sea necesario o inevitable. Entiendo que en el caso de autos no era necesario declarar inconstitucional la antes citada Ley Núm. 142 porque la decisión del Tribunal confirma la resolución apelada. La apelación y la revisión se dan contra la decisión y no contra sus fundamentos. La mesura debe caracterizar el empleo de las declaraciones de anticonstitucionalidad cuando hay disponibles otras soluciones para el problema bajo examen.

Regresando a los términos utilizados por la propia Constitución, en su Sec. 18 antes citada, no debe haber duda de que la Autoridad de Acueductos es una agencia pública, de que presta un servicio público esencial y de que el cese de sus operaciones pone en peligro la salud pública y constituye una grave emergencia. Entiendo que ejerciendo la facultad para legislar para estos casos que la propia Constitución le confirió—por claras razones de orden público—a la Asamblea

Legislativa dicha Asamblea tenía y tiene facultad para aprobar una ley como la Ley Núm. 142 antes mencionada.