JUNTA DE RELACIONES DEL TRABAJO, demandante y recurrida, *v.* CORPORACIÓN DEL CONSERVATORIO DE MÚSICA DE PUERTO RICO, demandada y peticionaria.

*Número:* CE-94-300 *Resuelto:* 20 de marzo de 1996

*Daniel R. Domínguez*, abogado de la parte peticionaria; *Leticia Rodríguez García*, abogada de la parte recurrida.

EL JUEZ ASOCIADO SEÑOR FUSTER BERLINGERI emitió la opinión del Tribunal.

Nos toca decidir si los miembros de la facultad del Conservatorio de Música de Puerto Rico tienen derecho a organizarse y a negociar colectivamente.

I

El 20 de marzo de 1987, la Asociación de Profesores del Conservatorio de Música de Puerto Rico (en adelante la Asociación) presentó una petición para investigación y certificación de representante ante la Junta de Relaciones del Trabajo de Puerto Rico (en adelante la Junta). Luego de celebrar unas audiencias públicas de junio a diciembre de 1987, la Junta emitió su decisión el 11 de abril de 1989.

En su decreto, la Junta determinó que los profesores del Conservatorio de Música de Puerto Rico (en adelante el

Conservatorio), salvo por algunas excepciones,(¹) eran empleados con derecho a unionarse y no eran "empleados gerenciales". Conforme sus determinaciones, la Junta ordenó que se celebrara la correspondiente elección entre los profesores del Conservatorio.

Posteriormente, el Conservatorio solicitó de la Junta la reconsideración del referido decreto. Adujo, por primera vez, que la Junta carecía de jurisdicción, ya que el Conservatorio no era patrono según lo definen el Art. 2 de la Ley de Relaciones del Trabajo de Puerto Rico, Ley Núm. 130 de 8 de mayo de 1945 (29 L.P.R.A. sec. 63), y la Sec. 17 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1. En vista de este nuevo planteamiento, la Junta ordenó la paralización de las elecciones de representación, reabrió los procedimientos y celebró nuevas audiencias.

Sometida por las partes toda la prueba que consideraron pertinente para adjudicar la controversia jurisdiccional, la Junta emitió, el 3 de julio de 1991, una decisión y orden suplementaria mediante la cual concluyó que el Conservatorio era "patrono" y que, por lo tanto, procedía la elección de representación de acuerdo con lo previamente ordenado. Posteriormente, se celebraron las elecciones en el Conservatorio. La Asociación fue seleccionada como representante de los profesores del Conservatorio para la negociación colectiva y certificada como tal.

No obstante lo anterior, el Conservatorio se negó a negociar con la Asociación, por lo que ésta solicitó a la Junta que presentara un cargo bajo el Art. 8(1)(d) de la Ley de

---

(¹) En específico, la Junta de Relaciones del Trabajo de Puerto Rico (en adelante la Junta) ordenó que los empleados con derecho a participar en la elección eran "todos los profesores permanentes, temporeros, probatorios y sustitutos a tarea parcial o completa que utiliza el patrono; excluidos [sic]: Ejecutivos, Administradores, Supervisores, Miembros de la Junta de Directores, Rector, Decanos, Jefes o Directores de Departamentos, empleados íntimamente ligados a la gerencia, empleados confidenciales, empleados comprendidos en otras unidades y toda otra persona con autoridad para emplear, ascender, disciplinar, despedir o de otra manera variar el "status" de los empleados o hacer recomendaciones al efecto ...". *Conservatorio de Música de Puerto Rico*, Dec. de la J.R.T. Núm. D-1123, pág. 40 (1989).

Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 69(1)(d), por práctica ilícita de trabajo.[2] El Conservatorio levantó nuevamente como defensas la falta de jurisdicción de la Junta, por no ser "patrono" el Conservatorio, y el que los profesores de dicha institución son empleados gerenciales sin derecho a sindicarse. La Junta convocó a una vista ante un Oficial Examinador, en la cual la Asociación objetó oportunamente la presentación de nueva prueba por parte del Conservatorio, en apoyo de las referidas defensas afirmativas, por ser esto un intento de relitigar los decretos de la Junta durante el procedimiento de representación. El Oficial Examinador acogió la objeción, pero mediante un ofrecimiento de prueba del Conservatorio se incluyó la evidencia en cuestión como parte del expediente.

Presentados los argumentos de las partes y el informe del Oficial Examinador, la Junta declaró al Conservatorio incurso en práctica ilícita de trabajo por su negativa a negociar. Le ordenó que desistiera de tal práctica y negociara con la Asociación los términos de empleo de los profesores de la institución, retroactivo a febrero de 1990.

El Conservatorio, además de solicitarle a la Junta la reconsideración de su orden, decidió no acatarla. Debido al desacato del Conservatorio, la Junta acudió al Tribunal Superior de Puerto Rico, Sala de San Juan, y le solicitó que pusiera en vigor su orden. El Conservatorio compareció en oposición a la referida petición y le pidió al tribunal de instancia que revisara colateralmente las determinaciones hechas por la Junta durante el procedimiento de representación.[3]

---

[2] El Art. 8(1)(d) dispone:

"(1) Será práctica ilícita de trabajo el que un patrono, actuando individualmente o concertadamente con otros:

 . . . . . .

"(d) Rehúse negociar colectivamente con el representante de una mayoría de sus empleados en una unidad apropiada de negociación colectiva, sujeto a las disposiciones de la sec. 66 de este título." 29 L.P.R.A. sec. 69(1)(d).

[3] Específicamente, el Conservatorio de Música de Puerto Rico (en adelante el Conservatorio) alegó que la Junta había errado al asumir la jurisdicción en este

Presentados los argumentos de las partes, el Tribunal Superior de Puerto Rico, Sala de San Juan, mediante Sentencia de 21 de marzo de 1994, accedió a la petición de la Junta y confirmó sus referidas determinaciones.

Inconforme con la sentencia del tribunal de instancia, el Conservatorio recurrió ante nos, mediante auto de *certiorari*, el 25 de abril de 1994. Nos solicitó que revocáramos dicha sentencia y que dejásemos sin efecto las determinaciones de la Junta en el procedimiento de representación.[4]

Mediante Resolución de 22 de julio de 1994, expedimos el auto solicitado y le ordenamos a las partes que, además de discutir los errores señalados en la petición de *certiorari*, examinaran a fondo si el Conservatorio era patrono o no bajo las disposiciones de la Ley de Relaciones del Trabajo de Puerto Rico y la Constitución del Estado Libre Asociado de Puerto Rico.

Elevados los autos y sometidos los alegatos de las partes, procedemos a resolver.

## II

Inicialmente debemos de determinar si los profesores del Conservatorio son "empleados gerenciales" sin derecho a unionarse y a la negociación colectiva, ya que si lo son, no es necesario determinar si la institución recurrente es "pa-

---

procedimiento, ya que éste no era "patrono", y al concluir que los profesores eran empleados con derecho a sindicarse y no empleados gerenciales.

[4] En particular, el Conservatorio alegó:

"A. ERRO EL HONORABLE TRIBUNAL DE INSTANCIA AL CONFIRMAR Y PONER EN VIGOR UNA DETERMINACION DE LA JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, EMITIDA SIN JURISDICCION, ENCONTRANDO QUE LA PETICIONARIA INCURRIO EN PRACTICA ILICITA DE TRABAJO."

"B. ERRO EL HONORABLE TRIBUNAL DE INSTANCIA AL CONFIRMAR Y PONER EN VIGOR UNA DETERMINACION DE LA JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, ORDENANDOLE A LA CORPORACION DEL CONSERVATORIO DE MUSICA DE PUERTO RICO NEGOCIAR CON UN GRUPO DE EMPLEADOS EXCLUIDOS DE LA LEY."

trono" o no. *U.P.R. v. Asoc. Pur. Profs. Universitarios*, 136 D.P.R. 335 (1994)([5]).

█ Para que una persona o un grupo de personas puedan disfrutar los derechos a unionarse y a negociar colectivamente deben ser "empleados" dentro del alcance de la Ley de Relaciones del Trabajo de Puerto Rico (en adelante la Ley). *U.P.R. v. Asoc. Pur. Profs. Universitarios*, supra. La definición de "empleado" que esta ley contiene expresamente excluye a los individuos que trabajan en el servicio doméstico, a individuos empleados por sus padres o cónyuges, y a ejecutivos y supervisores. 29 L.P.R.A. sec. 63(3). Existen también otras exclusiones que han sido establecidas mediante interpretación administrativa o judicial, una de las cuales es la del "empleado gerencial". Íd.

█ De acuerdo con la jurisprudencia federal,([6]) la Junta ha adoptado la norma de excluir de toda unidad apropiada de negociación colectiva a empleados íntimamente ligados al interés o quehacer gerencial. *Fondo del Seguro del Estado*, Dec. de la J.R.T. Núm. D-565 (1970). En *Compañía de Turismo*, Dec. de la J.R.T. Núm. D-814 (1980), la Junta definió al empleado gerencial como aquel que: (1) tiene ideas, intereses y actitudes alineadas con las de la gerencia; (2) formula o determina la política y las

---

([5]) La controversia de si el Conservatorio es patrono o no es principalmente de *índole constitucional*. Por ello, aplica aquí la reiterada doctrina de no resolver una controversia sobre bases constitucionales cuando existan fundamentos de otra índole que nos permitan disponer del caso. *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958). Conforme la referida doctrina, debemos considerar primero el asunto de si los empleados del Conservatorio son "gerenciales", que es un asunto principalmente de *interpretación estatutaria*.

([6]) En *NLRB v. Bell Aerospace Co.*, 416 U.S. 267 (1974), el Tribunal Supremo federal estableció que los "empleados gerenciales" no tienen derecho a negociar colectivamente. Al así hacerlo, el Tribunal adoptó la norma que había estado siguiendo la Junta Nacional de Relaciones del Trabajo desde 1946. Dicha Junta Nacional ha excluido del concepto normativo de "empleado" a aquellos trabajadores que considera "gerenciales", ya que desempeñan funciones que los relacionan o vinculan directamente con la política patronal, tal como es el caso de los empleados que están excluidos estatutariamente por ser "supervisores". Véanse: *Palace Laundry Dry Cleaning Corporation*, 75 N.L.R.B. 320 (1947); *Ford Motor Company*, 66 N.L.R.B. 1317 (1946).

normas administrativas y gerenciales del patrono en el curso de su trabajo, y (3) ejercita un alto grado de discreción para realizar su labor sin que tenga que conformarse a unas normas predeterminadas por el patrono. Véanse, además: *Compañía de Fomento de Turismo y Asociación de Inspectores de Juegos de Azar*, Dec. de la J.R.T. Núm. D-645 (1983); *Banco Gubernamental de Fomento*, Dec. de la J.R.T. Núm. 594 (1972).

En *U.P.R. v. Asoc. Pur. Profs. Universitarios*, supra, adoptamos la doctrina establecida por el Tribunal Supremo de Estados Unidos en *NLRB v. Yeshiva University*, 444 U.S. 672 (1980),[7] y extendimos, por primera vez en nuestra jurisdicción, la norma de "empleado gerencial" al ámbito universitario. En esa ocasión concluimos que un profesor universitario se considera "gerencial", y por lo tanto excluido del derecho a negociar colectivamente, si puede hacer recomendaciones efectivas sobre asuntos universitarios. *U.P.R. v. Asoc. Pur. Profs. Universitarios*, supra pág. 46.[8] Resolvimos que en el Recinto de Río Piedras de la Universidad de Puerto Rico existía un esquema de "autoridad colegiada", en virtud del cual el profesorado universitario, a través de su variada participación en los

---

[7] En *NLRB v. Yeshiva University*, 444 U.S. 672 (1980), el Tribunal Supremo de Estados Unidos aplicó la doctrina de *NLRB v. Bell Aerospace Co.*, supra, a la facultad de la Universidad de Yeshiva y resolvió que los que la constituían eran empleados gerenciales excluidos de la protección de la ley. Al así resolver, el máximo foro judicial de Estados Unidos identificó como consideración primordial en este caso si la facultad ejercitaba una autoridad que, en cualquier otro contexto, sería considerada gerencial. *NLRB v. Yeshiva University*, supra, pág. 686. A base de este criterio, la autoridad de los profesores sobre asuntos académicos fue estimada como una de las funciones "gerenciales" de mayor importancia. En resumen, el Tribunal determinó que los miembros de la facultad de Yeshiva eran empleados gerenciales porque ejercían un control determinante sobre cuestiones académicas a través de su participación en reuniones y organismos claustrales, y porque ocupaban un papel predominante en decisiones no académicas que afectaban sus condiciones de trabajo aun cuando la decisión final fuese de un cuerpo administrativo central.

[8] Rechazamos así el argumento de la Junta de que los profesores de la Universidad de Puerto Rico no eran "empleados gerenciales" porque su función dentro de la estructura administrativa universitaria era "puramente asesora" y, además, sólo sobre aspectos " 'puramente académicos, inherentes a la profesión del magisterio' ". *U.P.R. v. Asoc. Pur. Profs. Universitarios*, 136 D.P.R. 335, 391 (1994).

distintos cuerpos representativos y procesos institucionales, tenía una ingerencia efectiva en la formulación y aplicación de las normas académicas de la institución. *U.P.R. v. Asoc. Pur. Profs. Universitarios*, supra, pág. 48. Concluimos, entonces, que todos los profesores de dicho Recinto eran "empleados gerenciales", ya que a través de sus respectivos y complementarios quehaceres universitarios recaía en ellos principalmente la conducción y manejo de los asuntos académicos, por lo que no les cobijaba el régimen de negociación colectiva.

Expuesta sucintamente la norma que formulásemos en *U.P.R. v. Asoc. Pur. Profs. Universitarios*, supra, nos toca examinar ahora las determinaciones de la Junta sobre este particular, y su fundamento jurídico, en cuanto al caso de autos.

## III

La Junta, en el caso ante nos, se cuestionó si debía aplicar la normativa de *NLRB v. Yeshiva University*, supra. Se refirió a lo resuelto por ella en *Autoridad de Energía Eléctrica*, Dec. de la J.R.T. Núm. 900 (1982).[9] En el referido caso, la Junta resolvió que sólo debe ser excluido de la unidad apropiada el empleado que en la ejecución de la política gerencial "pueda afectar directa o indirectamente el *status* de otros trabajadores". *Autoridad de Energía Eléctrica*, supra. En el caso de autos, la Junta aplicó este criterio y determinó que los profesores del Conservatorio no eran empleados gerenciales porque no intervenían de forma directa en la determinación de la política administrativa, financiera o de personal de dicha institución. Sin embargo, a diferencia de lo decidido en *U.P.R. v. Asoc. Pur.*

---

[9] La Junta alegó que debido a que en Puerto Rico, a diferencia de Estados Unidos, la negociación colectiva tiene rango de derecho constitucional procedía que se adoptara una doctrina de exclusión de empleados "íntimamente ligados a la gerencia" más restrictiva que la federal. *Conservatorio de Música de Puerto Rico*, supra.

*Profs. Universitarios*, supra, en el caso ante nos la Junta tomó en cuenta el criterio de *Yeshiva University*, supra, y admitió que, en determinadas circunstancias, la intervención del profesorado en la implantación de normas académicas podría afectar indirectamente el *status* de empleo del personal docente. Por lo tanto, en situaciones en que la unidad apropiada solicitada estuviese integrada por profesores, la Junta resolvió que se debía determinar si el efecto que produce la intervención de éstos en la implantación de normas académicas es *"significativo, real y efectivo"*, en cuyo caso los referidos profesores se debían excluir de la unidad. La Junta, pues, a diferencia de lo ocurrido en *U.P.R. v. Asoc. Pur. Profs. Universitarios*, supra, indagó si las recomendaciones claustrales sobre asuntos universitarios eran substancialmente efectivas o no; luego de evaluar la prueba presentada al respecto, concluyó que no lo eran.

■ Según veremos, las determinaciones de la Junta sobre el entramado decisional en el Conservatorio y sobre la ingerencia y poder de recomendación de su profesorado fueron correctas conforme la legislación vigente al momento de ocurrir los hechos de este caso. Entonces, la Ley Orgánica de la Corporación del Conservatorio de Música de Puerto Rico, Ley Núm. 77 de 30 de mayo de 1980, según enmendada por la Ley Núm. 2 de 31 de julio de 1985 (18 L.P.R.A. secs. 1163c–1163h, establecía la estructura administrativa del Conservatorio. Pero, estando sometido este caso ante nos, se aprobó la Ley Núm. 141 de 9 de agosto de 1995 (18 L.P.R.A. sec. 1163c *et seq.*). Esta desvinculó al Conservatorio de la Corporación de las Artes Musicales (en adelante la C.A.M.), de la cual era subsidiaria desde 1985, para convertirlo en una corporación pública "autónoma". La referida Ley Núm. 141 alteró la estructura administrativa del Conservatorio, por lo que debemos examinar, a su amparo, si los cambios aludidos afectan las determinaciones que hizo la Junta.

La dirección del Conservatorio recaía antes en la Junta

de Directores de la C.A.M.([10]) Como cuerpo rector del Conservatorio, le correspondía a la Junta de Directores de la C.A.M. adoptar las normas, los reglamentos y los procedimientos necesarios para regir y conducir la marcha de la institución. La Junta de Directores de la C.A.M. también nombraba el Consejo General del Conservatorio, cuyos miembros constituían el organismo de dirección y supervisión inmediata sobre el Rector del Conservatorio respecto a la dirección e instrumentación de los programas y operaciones bajo la jurisdicción de la C.A.M. 18 L.P.R.A. sec. 1163f.

Al desvincularlo de la C.A.M., la Ley Núm. 141, *supra*, dispuso que el Conservatorio tendrá su propia Junta de Directores para ejercer esencialmente los mismos poderes que ejercía la Junta de Directores de la C.A.M. La nueva Junta de Directores también ejercerá las funciones del antiguo Consejo General, que ahora no existe en el actual esquema administrativo de la institución.([11])

El Rector del Conservatorio, nombrado por la Junta de Directores de éste, previa consulta con la facultad y el estudiantado, es el principal oficial ejecutivo de la institución. La Ley Núm. 141, *supra*, reconoce estatutariamente los poderes que le habían sido delegados al Rector a través de los años, por la Junta de Directores de la C.A.M. y por el antiguo Consejo General, además de los que ya se le reconocían en la anterior Ley Orgánica del Conservatorio. Según la Sec. 6 de la Ley Núm. 141, *supra*, 18 L.P.R.A. sec. 1163f, el Rector ejercerá los poderes siguientes:([12])

---

([10]) Desde 1985 hasta agosto de 1995 el Conservatorio fue una corporación subsidiaria de la Corporación de las Artes Musicales (en adelante la C.A.M.).

([11]) La Sec. 5 de la Ley Núm. 141 de 9 de agosto de 1995 (18 L.P.R.A. sec. 1163e(e)) dispone que los Miembros del Consejo General, en funciones al momento de la vigencia de ésta, continuarán fungiendo como miembros de la Junta de Directores del Conservatorio hasta el vencimiento de sus actuales nombramientos.

([12]) Esta enumeración no se entenderá como una limitación a la delegación de otros poderes por parte de la Junta de Directores.

(a) Hacer cumplir los objetivos, normas, reglamentos y planes presupuestarios y de desarrollo del Conservatorio.

(b) Representar oficialmente al Conservatorio.

(c) Formular un Plan de Desarrollo para el Conservatorio para la consideración de la Junta.

(d) Someter a la Junta los reglamentos de aplicación general y todos aquellos asuntos que requieran su aprobación.

(e) Formular el proyecto de presupuesto anual y someterlo a la Junta para su consideración y aprobación, y una vez aprobado el mismo, someterlo a los organismos gubernamentales correspondientes.

(f) Someter a la Junta, para su consideración, los nombramientos de los decanos y de cualquier otro funcionario que requiera confirmación.

(g) Nombrar y contratar personal docente y clasificado del Conservatorio.

(h) Orientar y supervisar el (sic) personal del Conservatorio y las funciones docentes, técnicas de investigación y administrativas.

(i) Nombrar conferenciantes visitantes y cualquier otra clase de personal visitante.

(j) Establecer y mantener relaciones con instituciones de educación superior y centros de cultura de Puerto Rico y el exterior.

Además del Rector y de los Decanos de Administración y Asuntos Académicos, a los cuales, conforme la Ley Núm. 141, *supra*, les compete las funciones gerenciales ordinarias en el Conservatorio, el Reglamento de la Facultad establece el puesto de Director de Departamento y le delega amplios poderes gerenciales sobre los respectivos departamentos de la institución. Art. XIII, Sec. 13.1 del Reglamento de la Facultad. Dicho Reglamento continúa en vigor, ya que la sección 8(b) de la Ley Núm. 141 dispone que los reglamentos que estaban vigentes al momento de aprobarse la misma continuarán vigentes hasta tanto sean enmendados o derogados por la nueva Junta de Directores. Conforme lo dispuesto por el referido Reglamento, los Directores de Departamento son nombrados por recomendación del Decano de Estudios al Rector, previa consulta con los profesores del departamento. El Rector hace el nombramiento y lo somete a la Junta de Directores para su aprobación final. Art. XIII, Sec. 13.4 del Reglamento de la

Facultad. Las funciones de los Directores de Departamento son:

(a) Evaluar y supervisar al personal docente de su Departamento.

(b) Planificar con el Decano de Estudios, la Registradora y con los miembros de su Departamento, las clases a ofrecerse.

(c) Revisar, con los miembros de su Departamento, el currículo y someter sus recomendaciones para la consideración del Comite de Currículo y del Senado Académico y finalmente con la aprobación del Decano de Estudios y del Rector.

(d) Asignar los horarios de los profesores de su Departamento, previa coordinación con el Decano de Estudios y la Registradora.

(e) Proveer adiestramiento o actividades de mejoramiento profesional para los miembros de su Departamento y los recursos disponibles.

(f) Organizar los asuntos estudiantiles de su Departamento.

(g) Someter al Decano de Estudios y de Administración los pedidos de libros, música, discos, equipos, instrumentos, etc. según las necesidades de su Departamento y los recursos disponibles.

(h) Participar como jurado en los exámenes finales.

(i) Citar un mínimo de dos reuniones departamentales al semestre para dilucidar problemas, planteamientos, recomendaciones, etc., que tengan los miembros de su Departamento. Informar por escrito al Decano de Estudios del resultado de esas reuniones.

(j) Rendir un informe semestral escrito al Decano de Estudios sobre la labor realizada.

(k) Coordinar con los miembros de su departamento, los exámenes departamentales y supervisar la administración de los mismos.

(l) Coordinar con los miembros de su departamento, los exámenes correspondientes a la remoción de incompletos a la fecha estipulada en el calendario académico. Igualmente, coordinará y supervisará los exámenes de convalidación de cursos.

(m) Realizar cualquier otra función relacionada con sus responsabilidades como Director de Departamento, que le solicite el Rector y/o el Decano de Estudios.

Por su parte, la Junta de Directores de la C.A.M. promulgó el Reglamento del Senado Académico del Conservatorio y el Reglamento del Personal Docente —que también continúan vigentes— mediante los cuales se crearon una

serie de cuerpos con la intención de integrar a la comunidad académica, y en específico a la facultad, al esquema administrativo del centro docente. El principal de estos cuerpos es el Senado Académico, el que al momento de los procedimientos ante la Junta estaba integrado por diecisiete (17) miembros, de los cuales diez (10) eran profesores electos por el claustro,[13] cinco (5) eran administradores, miembros *ex officio*,[14] y dos (2) eran estudiantes. Art. 3, Sec. 3.1 del Reglamento del Senado Académico.

De acuerdo con el preámbulo de su Reglamento, el Senado Académico del Conservatorio "constituye el foro principal de la comunidad académica a través del cual la facultad participa en los procesos institucionales". Según su Reglamento, el Senado Académico del Conservatorio es el cuerpo asesor de la administración en los asuntos académicos. Las funciones concretas de los senadores son varias. Estas son:

(1) Recomendar al Decano de Estudios todos los proyectos aprobados por el Senado relacionados con cambios de programas curriculares, supresión o creación de cursos ....

(2) Recomendar la justa y equitativa distribución de créditos para el Grado de Bachiller en Música, dentro de las distintas especialidades.

(3) Velar por la excelencia académica en todos los niveles de enseñanza en el Conservatorio.

(4) Aprobar y recomendar a los Decanos de Estudios y Administración la política de admisión de estudiantes a la institución y cambios a la misma.

(5) Analizar los expedientes de los candidatos a graduación y hacer las recomendaciones al efecto.

(6) Revisar el Reglamento de la Facultad y el Reglamento de Estudiantes y hacer las recomendaciones pertinentes a la Junta de Directores.

[13] Cada uno de los seis (6) departamentos del Conservatorio elegía a un representante, mientras que cuatro (4) profesores eran electos por acumulación en representación del claustro en general.

[14] Los senadores académicos *ex officio*, miembros de la administración, lo eran: (1) el Rector; (2) el Decano de Administración; (3) el Decano de Asuntos Académicos; (4) el Registrador, y (5) el Director del Programa de Cuerdas.

(7) Analizar y hacer recomendaciones a los correspondientes funcionarios sobre los asuntos que afecten la vida estudiantil, esencialmente [sic] sobre los relacionados con los aspectos académicos de la misma.

(8) Analizar y hacer recomendaciones a los correspondientes funcionarios sobre los asuntos que afecten la vida claustral, esencialmente [sic] sobre los relacionados con los aspectos académicos de la misma.

(9) Cualquier otro asunto de orden académico que pueda tratarse [sic] a su atención por el cuerpo administrativo a cargo. Art. 2, Sec. 2.1–2.9 del Reglamento del Senado Académico.

Además del Senado Académico, existe una serie de comités institucionales que tiene como propósito la participación de la facultad en la administración del Conservatorio. Existen seis (6) comités permanentes. Estos son: el Comité de Admisiones, el Comité de Personal, el Comité de Actividades, el Comité de Biblioteca, el Comité de Becas y el Comité de Graduación.([15])

El Comité de Personal lo crea y rige el Reglamento de Personal Docente y lo lo integran: el Decano de Estudios, el Director del departamento concernido y un profesor seleccionado anualmente por cada departamento. Este Comité asesora al Rector en la evaluación del personal docente y somete recomendaciones para considerar nombramientos, ascensos, licencias, permanencias y otras acciones relacionadas. Las recomendaciones del Comité se le refieren al Decano de Administración. Éste las remite, con sus propias recomendaciones presupuestarias, al Rector. El Rector evalúa las recomendaciones del Comité y del Decano, y entonces somete su recomendación a la Junta de Directores para la acción final.

Por último, el Reglamento de la Facultad le reconoce a los profesores ingerencia en los asuntos administrativos y académicos de sus respectivos departamentos. A nivel departamental, el Reglamento provee, de manera general, que a los profesores se les consulte sobre el desarrollo más

---

([15]) Existe un Comité de Disciplina de naturaleza *ad hoc.*

efectivo de los objetivos departamentales y, en específico, sobre el currículo a ofrecerse, la distribución de las clases y sus horarios, la elección del director del departamento y la administración de los exámenes de entrada y los exámenes finales. Art. XII, Sec. 122 del Reglamento de la Facultad.

Como puede observarse, el cambio principal efectuado por la nueva Ley Núm. 141, *supra*, en la estructura administrativa del Conservatorio es el relacionado con la creación de su propia Junta de Directores. En lo demás, la organización de la institución y su entramado decisional son los mismos que fueron examinados por la Junta de Relaciones del Trabajo al emitir su decisión en el procedimiento de representación de este caso.

## IV

■ Visto el esquema administrativo del Conservatorio, resolvemos que son correctas las determinaciones de la Junta al efecto de que en el Conservatorio no existe un esquema de autoridad colegiada de la facultad que justifique la exclusión general del profesorado del régimen de negociación colectiva. Es evidente, como concluyó la Junta, que los comités y órganos administrativos en los cuales los profesores participan, sólo intervienen de manera muy limitada en la formulación de las políticas institucionales, tanto en lo académico como en lo administrativo. Las opiniones e ideas de los profesores, incluso las de aquellos que son miembros de los comités institucionales y del Senado Académico, tienen un efecto mínimo en la administración del Conservatorio. Sus recomendaciones sobre los asuntos del Conservatorio son sólo eso. No son sustancialmente efectivas. No intervendremos, pues, con la conclusión de la Junta de que los profesores del Conservatorio no son empleados gerenciales.

■ Un examen del esquema administrativo del Conservatorio demuestra que ha habido algún intento de crear

unos espacios para la participación de la facultad en la formulación de la política académica y administrativa. Sin embargo, un análisis exhaustivo del expediente administrativo demuestra que la Junta tuvo ante sí prueba que indica que, en el funcionamiento *real* del Conservatorio, la intervención de los profesores en la dirección institucional es muy limitada. Contrario a lo que determinamos que ocurre en el Recinto de Río Piedras de la Universidad de Puerto Rico, en el Conservatorio los claustrales como grupo no tienen de hecho una ingerencia efectiva en la formulación y aplicación de las normas académicas de la institución.

A. Comenzamos por la prueba aportada sobre el Senado Académico. Existe prueba sustancial en el expediente que apoya la determinación de la Junta de que el poder que se le ha concedido a éste para intervenir en el diseño del currículo, en la implantación de nuevos programas educativos y en el desarrollo de normas académicas, es sumamente diluido y de escasa efectividad.

En lo referente al diseño del currículo —que constituye una de las labores académicas primordiales— la prueba presentada demuestra que los profesores senadores no tienen autoridad para recomendar directamente cambios curriculares. Cualquier intento de los profesores de propiciar cambios en el currículo del Conservatorio tiene que pasar por un "filtro" gerencial. El Reglamento del Senado Académico establece que las propuestas sobre los cambios de programas curriculares, la supresión o la creación de cursos se iniciarán a nivel departamental, pasando luego al Comité de Currículo, antes de que éstas puedan ser consideradas por el Senado. Este procedimiento, en efecto, significa que el Senado sólo puede considerar aquellas propuestas que le sean referidas por el Comité de Currículo. En el Conservatorio, *el Comité de Currículo está integrado exclusivamente por la gerencia,* ya que sus miembros son el Decano de Estudios y los jefes de departamento. La inter-

vención del Comité de Currículo en el proceso de consulta tiene el efecto de limitar la participación de los profesores senadores a ofrecer meros comentarios sobre la adecuacidad de cambios curriculares propuestos, en última instancia, por la administración; por lo que su capacidad de afectar el *status* de los claustrales, directa o indirectamente, es muy limitada.

De la prueba aportada por las partes surgen varios hechos que demuestran el escaso poder que tiene el Senado Académico en la implantación de nuevos programas y en los cambios de currículo. La Junta tuvo ante sí prueba de que tanto el Programa de Cuerdas como el Programa de Maestros Itinerantes habían sido establecidos por la administración sin consultar previamente con el Senado. El Programa de Maestros Itinerantes lo implantó el Rector. Éste contrató a sus profesores, mientras que el Programa de Cuerdas fue diseñado por un experto extranjero contratado por la administración sin contar con la intervención del claustro. Otro incidente en el cual la Junta, correctamente, hizo énfasis fue el intento de la administración por establecer un nuevo bachillerato con especialidad en música popular. Este bachillerato fue desarrollado por la propia administración. Ésta contrató a varios profesores, y hasta lo anunció en la prensa, antes de consultar al Senado sobre el mismo y sobre la oposición conocida de los profesores-senadores. La administración sólo desistió de implantar el referido programa luego de la protesta pública que hizo el claustro. El hecho de que un cambio curricular tan importante como ese se haya tratado de implantar sin la participación activa de la facultad, es prueba clara de la ausencia de un esquema de autoridad colegiada en el Conservatorio.

Además de evaluar la ingerencia del Senado Académico, la Junta evaluó a los comités institucionales del Conservatorio en los cuales participan los profesores. La prueba que obra en el récord demuestra que al menos cuatro (4) de

estos comités estuvieron inactivos hasta 1987 y que los demás no habían funcionado eficientemente. En específico, sobre el Comité de Personal (debido a su reciente creación al momento de darse los procedimientos de representación en el caso de autos (1988)) la Junta no tuvo evidencia suficiente ante sí que le permitiera determinar el efecto real que estaba teniendo dicho comité sobre las condiciones de trabajo de los claustrales. La Junta, por lo tanto, no erró al determinar que, de acuerdo con la prueba presentada durante el procedimiento de representación sobre la participación de los profesores en los Comités, no se justificaba su exclusión de la unidad apropiada.

La prueba evaluada por la Junta demuestra un esquema administrativo en el que el Rector, junto con los jefes de departamento, han ejercido directamente la mayor parte de las funciones del Senado Académico y de los comités institucionales, implantando ellos la política institucional, sin la intervención "significativa, real y efectiva" de los profesores del Conservatorio. Es sobre estos administradores en quienes recae principalmente la conducción y el manejo de los asuntos universitarios más importantes, tanto los académicos como los administrativos. En cuanto a los profesores, existe evidencia sustancial en el récord de que sus opiniones e ideas no tienen un efecto notable sobre el quehacer universitario.

Por otro lado, las enmiendas hechas a la Ley Orgánica del Conservatorio por la Ley Núm. 141, *supra*, no le reconocen a los profesores o a los órganos administrativos en los cuales éstos participan nuevos poderes o derechos que justifiquen alterar lo antes concluido. Las referidas enmiendas claramente no adelantan la creación de un esquema de autoridad colegiada en el Conservatorio, sino que más bien reafirman los amplios poderes ejercidos por la Junta de Directores y el Rector del Conservatorio.

Por todo lo anterior, resolvemos no intervenir con la determinación de la Junta en cuanto a que los profesores del

Conservatorio no son "empleados gerenciales" para propósitos de negociar colectivamente.

## V

Resuelto ya que los profesores del Conservatorio *no* son "empleados gerenciales" para fines de negociar colectivamente, debemos ahora determinar si el Conservatorio es "patrono" o no para los efectos de la Constitución o de alguna legislación pertinente.

■ La Constitución del Estado Libre Asociado de Puerto Rico reconoce a todos los empleados del sector privado el derecho a organizarse y a negociar colectivamente sus condiciones de trabajo, mas no así a todos los del sector público. Nuestra Ley Fundamental configura el derecho a la negociación colectiva sólo para los empleados públicos que trabajen en "agencias o instrumentalidades del gobierno que funcionen como empresas o negocios privados ...". Art. II, Sec. 18, Const. E.L.A., *supra*, ed. 1982, pág. 330. La Comisión sobre la Carta de Derechos de la Asamblea Constituyente, en su informe, indicó que:

> Los derechos congregados en torno al convenio colectivo no se hacen extensivos, en primer término, a los trabajadores o empleados del gobierno en sus funciones regulares, esto es, al ámbito de empleados públicos encargados de suplir los servicios normales del gobierno, ni tampoco a los empleados de agencias o instrumentalidades públicas cuando éstas *operan fuera de los supuestos de la empresa y el negocio privado.* En todos los casos así exceptuados, el empleo es incidental al servicio, constituyendo este último una responsabilidad indeclinable para con la ciudadanía. (Énfasis suplido.) 4 Diario de Sesiones de la Convención Constituyente 2574–2575 (1961).

■ Por imperativo constitucional, pues, el ordenamiento jurídico de Puerto Rico divide al sector público, para propósitos de negociación colectiva, en dos (2) grupos. Por un lado están los empleados públicos a los cuales se les reconoce un derecho *constitucional* a negociar colectiva-

mente en iguales condiciones que a los del sector privado por su similaridad con éstos. Por otro lado se encuentran aquellos empleados públicos que, por su similaridad a los que tienen cargos en el servicio gubernamental regular, están excluidos de dicha protección constitucional y no les es reconocida la capacidad de reclamarla. *J.R.T. v. Asoc. Servs. Médicos Hosp.*, 115 D.P.R. 360, 365 (1984).

La referida división fue el resultado de un acuerdo, durante el proceso de formular nuestra Constitución, entre los que proponían que se les reconociese *a todos los empleados*, fueran de la empresa privada o del Gobierno, el derecho a sindicarse y los que preferían que se les negase tal derecho a los empleados públicos, aun a aquellos en empresas de carácter privado explotadas por el Estado. J. Trías Monge, *Historia Constitucional de Puerto Rico*, San Juan, Ed. U.P.R., 1982, T. III, págs. 199–207; *J.R.T. v. Asoc. Servs. Médicos Hosp.*, supra, pág. 364. Entre aquellos que se opusieron inicialmente a la sindicación de los empleados públicos se encontraba el Gobernador de Puerto Rico de aquel entonces, Luis Muñoz Marín, quien veía graves peligros en concederle en la Constitución a todo empleado público el derecho a organizarse e irse a la huelga. Trías Monge, *op. cit.*, pág. 206. La propuesta inicial del Presidente de la Comisión de la Carta de Derechos, Jaime Benítez, reflejaba esta preocupación y le negaba a todos los empleados públicos el derecho a la sindicación y a la huelga. Trías Monge, *op. cit.*, pág. 202. Por otro lado, estaban aquellos que rechazaban que se discriminara contra empleados públicos de empresas identificadas con el sector privado, privándoseles de derechos tradicionalmente reconocidos a los trabajadores en dichos campos simplemente por el hecho de que su patrono fuese el Estado o una de sus agencias. Trías Monge, *op. cit.*, pág. 206. El acuerdo concertado, plasmado en la Constitución, le otorga rango constitucional al derecho a negociar colectivamente sólo para el limitado grupo de empleados que trabajan en una agencia

o instrumentalidad pública que funciona como negocio privado.

■ En *A.A.A. v. Unión Empleados A.A.A.*, 105 D.P.R. 437 (1976), examinamos por primera vez la cuestión de cómo decidir si una instrumentalidad pública funciona como negocio privado, a los fines de determinar si sus empleados tienen derecho a la negociación colectiva. En esa ocasión hicimos referencia a la discusión que de este asunto hubo en la Asamblea Constituyente. Concluimos "que no existe un solo criterio para determinar cuándo una agencia o instrumentalidad del gobierno funciona o no como una empresa o negocio privado y goza o no en consecuencia del derecho a la huelga". Íd., pág. 450. Reconocimos, sin embargo, la intención de los que redactaron la Constitución de que los *dos* (2) criterios, en torno a los cuales giró la discusión en la Asamblea Constituyente, fuesen "de vital importancia para la definición de los términos que nos ocupan". Íd, pág. 452.

Uno de los referidos criterios es *la naturaleza intrínseca* de la agencia o instrumentalidad pública en cuestión. Si ésta rinde servicios que nunca han sido prestados por empresas privadas, entonces su naturaleza tiende a ser *gubernamental* más bien que de negocio privado. Véase Diario de Sesiones, *supra*, Vol. 3, págs. 1618 y 1620. En cambio, si la instrumentalidad rinde servicios como los que prestan empresas privadas, y lo hace con propósitos lucrativos, su naturaleza tiende a ser la de un negocio privado. Íd.

El otro criterio fundamental formulado en la Asamblea Constituyente tiene que ver con la reglamentación de *las condiciones de trabajo* del empleado de la agencia o instrumentalidad concernida. La cuestión medular es si cosas tales como el salario, la permanencia en el puesto, las vacaciones y otras condiciones similares están *protegidas* por la ley o no. Si lo están, entonces la agencia o instrumentalidad tiende a ser gubernamental. Diario de Sesiones, *su-*

*pra*, Vol. 3, págs. 1613–1621. Como bien señaló el delegado Negrón López, el plan esencial en lo referente a los trabajadores en la Constitución a aprobarse consideraba que éstos habrían de estar protegidos por una de dos (2) maneras: por alguna legislación que les garantizase unas condiciones básicas de trabajo o, en ausencia de ésta, por algún convenio colectivo y por los derechos relativos a la negociación del mismo. Si el empleado estaba protegido por algún esquema normativo estatal, entonces no tenía derecho a la negociación colectiva, porque se entendía que la protección de ley sobre las condiciones de trabajo era equivalente a lo que la negociación colectiva le ofrecía como seguridad al trabajador.

En una de sus varias esclarecedoras intervenciones sobre este asunto, Negrón López explicó el plan constitucional de este modo:

> SR. NEGRON LOPEZ: Dentro de esa filosofía entiendo que los grupos de trabajadores, sean estos empleados de cualquier categoría o sean obreros de cualquier categoría, que estén de alguna manera relacionados con los instrumentos públicos, con las agencias regulares de servicio del gobierno, con las corporaciones y con todas las entidades gubernamentales que existan para propósitos gubernamentales o corporativos—entiendo que esos grupos de trabajadores han de estar en una de dos jurisdicciones: o han de estar regidos por las leyes que regulan las relaciones del trabajo, que llamamos en nuestra legislación actual del trabajo, la Ley de Relaciones del Trabajo, y en ese caso son obreros para todos los fines, y para ellos se estatuyen aquí las garantías para la protección y la defensa y bienestar; o de lo contrario son empleados del gobierno y tienen las otras garantías, igualmente respetables, del servicio civil.
>
> De manera que cuando yo preguntaba qué quiere decir agencias o instrumentalidades que funcionen como empresas privadas, yo no estaba preguntando si se refería a la naturaleza del negocio en sí; porque una empresa privada de *guaguas*, tiene unos chóferes que manejan una [sic] *guaguas*, y una empresa pública de *guaguas* tiene unos chóferes que manejan una [sic] *guaguas*; a estos chóferes les echan gasolina por la mañana en sus tanques, les entregan unos *tickets*, los mandan a la calle, les señalan unas rutas y las dos empresas funcionan de igual manera. Pero en la empresa privada, puesto que no es una

empresa gubernamental, los chóferes y los empleados han de estar regidos por la Ley de Relaciones del Trabajo, y a eso va encaminada, entiendo, esta disposición de la carta de derechos.

Ahora [con repecto a] los empleados de la empresa pública, que también funciona como una empresa privada—si están protegidos por la Ley de Personal, que supone permanencia en su empleo, que supone un plan de retribución mínima garantizada por ley, que supone vacaciones, *que es el equivalente para el servidor público de lo que en la negociación colectiva obtiene el obrero privado*—no hay ninguna razón para que nosotros no digamos categóricamente que "funcionar" no significa la naturaleza del negocio, sino que *funcionar como empresa privada, se refiere a cuál es la norma que va a regir el personal.* (Énfasis suplido.) Diario de Sesiones, *supra*, págs. 1617–1618.

En *A.A.A. v. Unión Empleados A.A.A.*, supra, págs. 455–456, reconocimos, además, que por razón de las realidades a que sirve y en que opera una Constitución, existían otros criterios que, junto con los dos (2) ya mencionados, podían considerarse para resolver cuándo es que una agencia funciona como una empresa privada; sugerimos varios de ellos "sin pretender agotar la lista". Íd., pág. 455. Resaltamos que lo esencial era "examinar en cada caso la conjunción de factores existentes para a su luz resolver si la agencia concernida funciona o no como un negocio privado en el sentido constitucional". Íd., pág. 456.

En el caso de autos, la Junta concluyó que el Conservatorio era un patrono para el propósito de la negociación colectiva. Por ello, resolvió que tenía jurisdicción para formular las órdenes que emitió durante el procedimiento de representación en este caso. Debemos determinar si tal conclusión es correcta a la luz de los criterios pertinentes referidos antes.

A. *Naturaleza de la instrumentalidad*

Para determinar que el Conservatorio era "patrono", la Junta descansó substancialmente en su apreciación de la situación financiera del mismo. Determinó que el Conservatorio era patrono, en gran medida, por entender que éste

tenía autonomía fiscal *y por ello podía funcionar como negocio lucrativo.* La Junta apoyó su conclusión en que el Conservatorio supuestamente tiene control absoluto de sus fondos y puede gastarlos de acuerdo con los objetivos de la Corporación; en que aprueba su propio sistema de contabilidad, y en que puede aceptar donaciones o préstamos e invertir el producto de éstos para cualquier fin corporativo válido.

El referido análisis de la Junta es sumamente defectuoso. Ésta erró no sólo en no aquilatar propiamente la naturaleza del Conservatorio como institución, sino, además, en no concederle suficiente peso en su apreciación a las limitaciones que tiene el Conservatorio en lo relativo a su presupuesto. La prueba que surge del expediente demuestra que, en realidad, el Conservatorio no tiene autonomía fiscal debido a su incapacidad de facto de generar sus propios fondos.

Como señalamos en *U.P.R. v. Asoc. Pur. Profs. Universitarios,* supra, las empresas que operan con fines de lucro obtienen ganancias que provienen de la venta de sus productos a precios que sobrepasan sus costos. Bajo este esquema, las decisiones gerenciales de la empresa tienen un impacto directo sobre sus fondos, ya sea mediante el control de los costos o la determinación de los precios. *Este esquema no se da ni puede darse en el Conservatorio.* De la prueba en autos se desprende que, para 1990, alrededor del ochenta y cinco por ciento (85%) del presupuesto del Conservatorio provenía del Fondo General del Estado Libre Asociado. En comparación, sólo el seis por ciento (6%) del presupuesto del Conservatorio provenía de la matrícula de los estudiantes. Excepto por una pequeña asignación autorenovable, la inmensa mayoría de los fondos públicos que recibía el Conservatorio provenían del presupuesto que anualmente es aprobado por la Asamblea Legislativa. Esto significa que el Conservatorio, para poder funcionar, depende esencialmente de los fondos que la

Asamblea Legislativa decida asignarle cada año. Además, tales fondos *tienen que ser gestionados anualmente, al igual que hacen otras agencias gubernamentales, a través de la Oficina de Presupuesto y Gerencia del Gobierno de Puerto Rico (en adelante O.P.G.).* Sec. 8 de la Ley Núm. 141, *supra*, 18 L.P.R.A. sec. 1163g.

Este es el proceder típico de las agencias y los departamentos gubernamentales cuyos presupuestos dependen de la asignación que se les haga del fondo general, mas no así el de aquellas corporaciones públicas que funcionan como empresas privadas, como lo son, digamos, la Autoridad de Energía Eléctrica y la Telefónica, que reciben una parte sustancial de sus ingresos de lo que cobran al público por sus servicios. Ya que obtienen una gran parte de sus ingresos de lo que cobran por sus servicios, las referidas corporaciones públicas, a diferencia del Conservatorio, gozan de considerable autonomía fiscal y resulta limitada la ingerencia de la O.P.G. y de la Asamblea Legislativa en la preparación de sus presupuestos.

Ante esta situación, la Junta concluyó que el hecho de que la mayor parte de los fondos del Conservatorio proviniera del presupuesto del Gobierno central, no era un impedimento para que éste fuese considerado como "patrono" porque, según la Junta, el Conservatorio tenía la facultad de aumentar sus ingresos de otras fuentes. Esto también constituye una apreciación errónea de parte de la Junta.

Al presente, según la Junta, el Conservatorio cobra por el uso de su planta física —teatros y salones— a entidades públicas y privadas que la alquilan ocasionalmente. El Conservatorio cobra también por las clases de música que ofrece fuera de su programa regular. La Junta determinó que el Conservatorio cobraba unas cantidades equivalentes a su valor real por los referidos servicios, pero que su ley orgánica no le prohibía cobrar más por estos. La Junta erró al darle un peso exagerado al posible valor financiero de estos tipos de servicio. Estos servicios representan, en-

tre todos, sólo un bajísimo por ciento de los ingresos del Conservatorio en comparación con los fondos gubernamentales. Más aún, no hay nada en las leyes que han creado y organizado el Conservatorio que permita suponer que dicha Institución se estableció para que funcionara como un negocio lucrativo. No le compete al Conservatorio aumentar el precio de sus servicios para obtener "ganancias", ya que tal no es su propósito institucional. Más bien, lo que le corresponde al Conservatorio es asegurar que todas sus políticas operacionales respondan al fin primordial de proveer educación musical a estudiantes talentosos. El Conservatorio, por lo tanto, está limitado en cuanto al arrendamiento de sus facilidades físicas y a la prestación de sus servicios docentes para otros propósitos que no estén directamente relacionados con la educación de sus estudiantes regulares. A través de estos servicios, es poco probable que el Conservatorio pueda aumentar sus ingresos de manera significativa sin quebrantar su misión estatutaria esencial.[16]

Por otro lado, la Junta determinó que el hecho de que el Conservatorio sólo cobrara por concepto de matrícula una cantidad *nominal* —ciento veinte dólares ($120.00) para 1988— no era un factor determinante, ya que la institución no estaba imposibilitada de aumentar legalmente sus costos de matrícula tanto como fuese prudente. Según la Junta, al unirse un aumento en el costo de la matrícula a lo que cobraba por otros servicios, el Conservatorio podría convertirse en una operación lucrativa. Esta conclusión es claramente errónea, no sólo por ser especulativa e irreal, sino además porque no guarda relación alguna con la naturaleza real del Conservatorio y los propósitos que hubo al crearlo, como ya hemos señalado.

■ El principal objetivo estatutario del Conservatorio

---

[16] Del expediente surge prueba de las pésimas condiciones en que se encuentra la planta física del Conservatorio, por lo que es poco probable que pueda recibir ingresos substanciales por el arrendamiento de la misma.

es proveer a los jóvenes talentosos del país la oportunidad de obtener una educación pública universitaria en el campo de la música *sin que importe la condición social o económica de éstos*. Se trata de una institución creada para implantar la importante política pública de promover el desarrollo y enriquecimiento de las artes musicales en el país, principalmente a través de la educación de profesionales de primer orden en el campo de la música. Si bien la labor de impartir educación musical es compartida con entidades privadas, la finalidad de promover tal educación a niveles de excelencia, sobre todo en relación con jóvenes talentosos de escasos recursos, convierten al Conservatorio en una Institución singular, de clara naturaleza gubernamental. Por ello, la premisa de la Junta de que el Conservatorio puede fijar los costos de matrícula a un nivel lo suficientemente alto como para convertirse en una institución fiscalmente autosuficiente es errónea. Resultaría inevitablemente en una seria limitación a la oportunidad de los jóvenes talentosos de escasos recursos de obtener una educación en el campo musical. Por su propia naturaleza como institución pública, según las leyes que lo crearon, el Conservatorio está impedido de convertirse en un centro docente dirigido a ofrecer educación musical sólo a aquellos estudiantes que puedan pagar altos costos.

El Conservatorio, pues, a diferencia de otras corporaciones públicas, no cobra ni puede cobrar sustancialmente lo que valen sus servicios. Ello lo coloca en una situación de dependencia permanente de los fondos públicos que las Ramas Ejecutiva y Legislativa acuerden asignarle.

 Otra característica que diferencia al Conservatorio no sólo de la empresa privada, sino también de gran parte de las corporaciones públicas, es que *no está autorizado para emitir bonos* y así financiar sus operaciones.[17]

---

[17] No obstante a que este hecho es crucial para determinar el grado de autonomía fiscal del Conservatorio, la Junta no parece haberlo tomado en consideración, ya que ni siquiera lo mencionó en su decisión.

Esta limitación priva al Conservatorio de una importante fuente de ingresos con la que cuentan las corporaciones del sector privado y gran parte de las del sector público. En este aspecto, el Conservatorio se asemeja fundamentalmente a las agencias y los departamentos gubernamentales que dependen exclusivamente de las asignaciones del fondo general para funcionar.

Privado de medios propios suficientes para generar ingresos, el Conservatorio no tiene ni remotamente el espacio que tienen las empresas privadas para manipular los elementos de "costos y ganancias" de modo que pueda encarar con éxito los reclamos que inevitablemente surgen de la negociación colectiva. Véase *U.P.R. v. Asoc. Pur. Profs. Universitarios*, supra. La Junta no examinó si realmente el Conservatorio, con todos los conocidos problemas económicos que ha sufrido durante su existencia, y de acuerdo con la prueba que hay en el expediente, podría funcionar adecuadamente bajo un régimen de negociación colectiva cuando tiene muy poco control real sobre sus ingresos principales. Las decisiones y acciones que realice el Conservatorio en el ejercicio de sus facultades legales quedan limitadas por su situación fiscal la cual, como hemos visto, no controla. No existe la supuesta autonomía fiscal que determinó la Junta, ya que el presupuesto operacional del Conservatorio depende de las decisiones que tomen la oficina de presupuesto y gerencia de la Rama Ejecutiva y de la Asamblea Legislativa.(¹⁸) Son estas últimas las que realmente determinan su presupuesto y, así, ejercen un grado substancial de control sobre el Conservatorio.(¹⁹) En resu-

---

(¹⁸) En cuanto al grado de control que ejerce, por ejemplo, la Oficina de Presupuesto y Gerencia, existe en el expediente prueba documental que señala que la administración del Conservatorio tenía que consultarle a ésta, para su aprobación, los ascensos y aumentos de sueldos que habían decidido conceder.

(¹⁹) En la Exposición de Motivos de la Ley Núm. 141, *supra*, 1995 (Parte 1) Leyes de Puerto Rico 594, se expresa que uno de los propósitos al enmendar la Ley Orgánica del Conservatorio es reconocerle su "autonomía operacional y fiscal". En realidad, dicha autonomía es sólo frente a la C.A.M., de la cual el Conservatorio ya no es una corporación subsidiaria. La Ley Núm. 141, *supra*, en nada altera el control

men, tanto por sus fines eminentemente públicos como por su esencial dependencia presupuestaria en la asignación de fondos públicos, el Conservatorio, como Institución, se asemeja mucho más a una agencia gubernamental típica que a una empresa privada. Véase *J.R.M. v. J.R.T.*, 108 D.P.R. 448 (1979).

B. *La reglamentación de las condiciones de trabajo de los empleados del Conservatorio*

La Junta consideró como determinante para concluir que el Conservatorio era patrono en el caso de autos que dicha Institución, en el pasado, ha negociado colectivamente con sus empleados no docentes, reconociendo así su *status* como patrono. Para examinar adecuadamente esta cuestión, es menester hacer un breve recuento del historial de negociación colectiva en el Conservatorio.

El Conservatorio de Música fue creado originalmente mediante la Ley Núm. 35 de 12 de junio de 1959 (18 L.P.R.A. secs. 1163–1163b) como un programa a ser administrado por el Festival Casals, Inc., que a su vez era una corporación pública subsidiaria de la Compañía de Fomento Industrial. En 1963, como parte de un procedimiento de representación instado por los empleados *no docentes* del Conservatorio, la Junta declaró a dicha Institución como "patrono" para propósitos de la negociación colectiva bajo la Ley Núm. 130, *supra*. La decisión de la Junta estuvo exclusivamente fundada en que el Conservatorio, para aquel momento, era una subsidiaria de la Compañía de Fomento Industrial, *la cual a su vez era una de las instrumentalidades públicas expresamente incluidas en la definición de patrono en la Ley*. Los empleados no docentes eligieron como su representante a la Unión Independiente de Empleados de la Compañía de Fomento Industrial. Ésta, por las siguientes dos (2) décadas, negoció

_____
fiscal y, por ende, operacional que ejercen las Ramas Ejecutiva y Legislativa sobre el Conservatorio.

varios convenios colectivos con la gerencia del Conservatorio.

En 1980, por virtud de la Ley Núm. 77, *supra*, se creó la Corporación del Conservatorio de Música de Puerto Rico como una corporación pública subsidiaria de la Administración para el Fomento de las Artes y la Cultura (en adelante la A.F.A.C.). La referida ley designó al Conservatorio como un administrador individual bajo la Ley de Personal del Servicio Público de Puerto Rico, Ley Núm. 5 de 14 de octubre de 1975, según enmendada, 3 L.P.R.A. sec. 1301 *et seq.* La eliminación del vínculo entre la Compañía de Fomento Industrial y el Conservatorio, y la inclusión de éste último bajo la citada ley de personal, llevó a la administración de la A.F.A.C. a cuestionar la continua vigencia de la determinación original de la Junta que reconocía al Conservatorio como patrono. Al vencerse el convenio colectivo con los empleados no docentes del Conservatorio en 1983, la A.F.A.C. se negó a volver a negociar con la Unión.

En 1985, como parte de una reforma de las instituciones culturales del Gobierno de Puerto Rico, la Asamblea Legislativa eliminó a la A.F.A.C. Creó en su lugar a la Corporación de las Artes Musicales —bajo la cual se colocó al Conservatorio— como corporación subsidiaria. Además, la Asamblea Legislativa enmendó la Ley Orgánica del Conservatorio para excluirla de las disposiciones de la Ley de Personal del Servicio Público de Puerto Rico. Ante este cambio estatutario, la Unión realizó gestiones para iniciar la negociación de un nuevo convenio colectivo entre la administración y los empleados no docentes del Conservatorio. La gerencia del Conservatorio le exigió a la Unión, previo al inicio de las negociaciones, que obtuviera de la Junta una certificación de representante. El 30 de enero de 1986 la Junta nuevamente certificó a la Unión como la representante de los empleados no docentes del Conservatorio. El Conservatorio accedió entonces a negociar.

Durante dichas negociaciones, la Junta de Directores de la C.A.M. le solicitó al Secretario de Justicia que emitiera una opinión en torno a si los empleados administrativos no docentes del Conservatorio tenían el derecho constitucional y estatutario a negociar colectivamente. El Secretario de Justicia declaró en su opinión, entonces, que él estaba imposibilitado de expresarse sobre este asunto debido a que la Junta ya había asumido jurisdicción y había hecho una determinación en este caso. Op. Sec. Just. Núm. 1987-17. Según la opinión del Secretario de Justicia, la Junta de Directores de la C.A.M. debía encauzar su consulta a través de la Junta. Íd. El Conservatorio firmó entonces el convenio colectivo con sus empleados no docentes, y volvió a firmar otro en 1993, el cual está vigente hoy.

La Junta determinó que al negociar varios convenios colectivos con sus *empleados no docentes*, el Conservatorio había aceptado su condición de patrono bajo la Constitución y la Ley, y que ello era determinante en este caso. La Junta intimó, además, que la propia Asamblea Legislativa había reconocido la condición de patrono del Conservatorio al excluir a sus empleados del ámbito de la Ley de Personal del Servicio Público de Puerto Rico. La Junta afirmó que, luego que la gerencia del Conservatorio cuestionara a la Unión sobre el derecho a la representación sindical de su matrícula debido a los cambios introducidos por la Ley Núm. 2, *supra*, y, en específico, por la inclusión de los empleados de la Corporación al Sistema de Personal, éstos gestionaron ante la Asamblea Legislativa la enmienda de dicha disposición. Según la Junta, la Asamblea Legislativa atendió el reclamo de los empleados del Conservatorio y, al enmendar la ley orgánica de la Corporación en 1985, lo excluyó de la citada ley de personal, por lo que la Junta concluyó que la Asamblea Legislativa reconoció el derecho a negociar colectivamente de los empleados del Conservatorio. Examinemos la validez de estos dictámenes de la Junta.

■ Según señalamos antes, la reglamentación de las condiciones de trabajo del empleado público es un factor importante en la determinación de si tal empleado tiene derecho constitucional o no a la negociación colectiva. Si el empleado público en cuestión no está protegido por la Ley de Personal del Servicio Público de Puerto Rico o por algún otro régimen análogo de servicio civil, su carácter como trabajador se asemeja al de las empresas privadas; por lo tanto, existiría un fundamento significativo en favor de la decisión de que tiene derecho a la negociación colectiva.

Al examinar los aludidos dictámenes de la Junta a la luz de esta normativa, es menester señalar que en lo que aquí nos concierne el referido historial de negociación colectiva en el Conservatorio de por sí no determina realmente la controversia ante nos. Sólo refleja que en el Conservatorio ha habido en unas épocas alguna negociación colectiva y en otros ninguna. En las instancias en que sí hubo negociación colectiva, ocurrió únicamente respecto a los *empleados no docentes* del Conservatorio. No incluyó a los profesores, que son los que están ante nos ahora. Se trata, pues, de un historial parcial e intermitente de negociación colectiva que no tiene la exagerada importancia que le atribuyó la Junta. No la tiene porque la mayor parte de tal negociación ocurrió en épocas cuando las circunstancias del Conservatorio eran sustancialmente distintas a las que esa Institución tiene ahora, por lo que dicho "precedente" de negociación colectiva es inaplicable a la situación actual. Tal es el caso de las negociaciones realizadas mientras el Conservatorio fue parte de la Compañía de Fomento Industrial, que a su vez era "patrono", por expresa definición de la Ley. Es decir, en la mayor parte de las referidas instancias en que hubo negociación colectiva entre el Conservatorio y los empleados no docentes, ello ocurrió porque en virtud de una *expresa designación legislativa* el Conservatorio era "patrono". Se negoció colectivamente entonces porque tal era el claro mandato legislativo. En la actuali-

dad, sin embargo, el legislador no ha designado "patrono" al Conservatorio como lo hizo de 1959 a 1980.

La otra instancia de negociación ocurrió en 1986, cuando el Conservatorio, a pesar de expresar serias dudas sobre el alegado derecho a la negociación, no lo cuestionó judicialmente. El mero hecho de haber accedido entonces al reclamo de negociar no establece un estado de derecho ni constituye un precedente vinculante que sea determinativo jurídicamente de la cuestión ahora ante nos.[20] Debe tenerse en cuenta que en Puerto Rico, tanto nuestra Constitución como la federal garantizan el *derecho de asociación*. R. Serrano Geyls, *Derecho constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1988, Vol. II, pág. 1496.[21] Ese derecho ciertamente permite que los empleados públicos que no están autorizados constitucionalmente a llevar a cabo acciones laborales concertadas puedan, al menos, organizar asociaciones y hacer reclamos a los que dirigen las entidades gubernamentales donde trabajan, incluso reclamos relacionados con las condiciones de trabajo. En tales casos, la gerencia de la entidad gubernamental —si tiene los recursos para ello— puede acceder prudencialmente a todos o a algunos de tales reclamos, sin que ello constituya "negociación colectiva" propiamente. Véanse: *Board of Trustees, etc. v. Public Emp. Council*, 571 S.W.2d 616 (1978); *American Federation of State, Co. & Mun. Emp. v. Woodward*, 406 F.2d 137 (8vo Cir. 1969). Entre una agrupación de empleados y su agencia, pues, puede haber intensos diálogos sobre las condiciones de empleo, incluso reclamos concretos y concesiones, sin que ello ocurra bajo el régimen jurídico de la ne-

---

[20] Es evidente que el derecho, como tal, a la negociación colectiva sólo surge de la Constitución o de alguna disposición legislativa. No se crea tal derecho sólo porque una agencia decida "negociar". Véase *Collazo Cartagena v. Hernández Colón*, 103 D.P.R. 870, 874 (1975).

[21] Además, en Puerto Rico se le ha reconocido estatutariamente a los referidos empleados públicos el derecho a organizarse en agrupaciones "bona fide". Ley Núm. 134 de 19 de julio de 1960 (3 L.P.R.A. sec. 702).

gociación colectiva. Por esta razón, también, el aludido historial en que descansó la Junta no tiene, como ya hemos señalado, la importancia que ésta le atribuyó.

Lo que sí tiene mucho peso, respecto a lo que nos toca resolver, es si las condiciones de trabajo de los profesores del Conservatorio están regidas o no por algún esquema normativo de servicio civil. Si no lo están —y, por lo tanto, dichos profesores no tienen una protección de ley respecto de las condiciones de empleo— entonces existiría un fundamento de peso para resolver que tienen derecho a ampararse bajo el régimen alterno de la negociación colectiva.[22]

La ley vigente respecto al Conservatorio —Ley Núm. 141, *supra*— en su Sec. 3(h), 18 L.P.R.A. sec. 1163d(h), dispone que éste estará exento de la Ley de Personal del Servicio Público de Puerto Rico. No obstante, dicha ley también ordena al Conservatorio a "adopta[r] un sistema de personal, planes de retribución y de clasificación y las reglas y reglamentos que sean necesarios para cumplir con dichos planes y sistemas". Íd. Más aún, dicha ley declara que los "funcionarios, agentes y empleados [del Conservatorio] serán empleados públicos clasificados y docentes con derecho a pertenecer a la Asociación de Empleados de[l] Gobierno de Puerto Rico [y] beneficiarse del Sistema de Retiro del Gobierno de Puerto Rico". Además, como el estatuto ordena la continuada vigencia de los reglamentos que prevalecían en el Conservatorio al momento de éste aprobarse, hasta tanto sean enmendados o derogados, sigue en vigor el Reglamento del Personal Docente del Conservatorio. En él se preceptúan unas condiciones esenciales de empleo, que incluyen cosas tales como tipos de

---

[22] Aludimos únicamente a los profesores, porque son los que están en controversia aquí. No estamos intimando la coexistencia en una misma agencia de dos (2) regímenes laborales distintos. La posibilidad, de ningún modo ortodoxa, de que una instrumentalidad pública sea "patrono" respecto de unos empleados —por no estar éstos protegidos por un régimen de servicio civil— pero que no lo sea respecto de otros —por estar éstos así protegidos— no está ante nos en este caso.

nombramiento, licencias, permanencia en el cargo, horarios de trabajo, beneficios marginales y otras.

■ Todo lo anterior evidencia que los profesores del Conservatorio están cobijados por un régimen de servicio civil. Sus condiciones de empleo están protegidas por un esquema jurídico de personal de tipo gubernamental, como el que se vislumbró en la Asamblea Constituyente para los empleados públicos que no tendrían derecho a la huelga y a la negociación colectiva. Diario de Sesiones, *supra*, págs. 1613–1614. Respecto a este importante segundo factor, la situación del Conservatorio se asemeja mucho más a una agencia gubernamental típica que a una empresa privada.

■ Por otro lado, no puede concluirse que la Asamblea Legislativa le concedió a los empleados del Conservatorio el derecho a la negociación colectiva en la legislación vigente referente a dicha instrumentalidad pública. Hemos reconocido que la Asamblea Legislativa tiene la facultad de conceder tal derecho a los empleados públicos, independientemente de si la instrumentalidad donde trabajan funciona como negocio privado o no. *F.S.E. v. J.R.T.*, 111 D.P.R. 505 (1981); *Morales González v. J.R.T.*, 121 D.P.R. 249 (1988). El derecho que se concede es sólo *de naturaleza estatutaria* —no es el que garantiza la Constitución a algunos empleados públicos— y como tal, la Asamblea Legislativa puede otorgarlo total o parcialmente, o abolirlo una vez concedido, según lo estime pertinente ese Cuerpo. La Asamblea Legislativa lo ha concedido a los empleados de instrumentalidades, tales como la Autoridad de Tierras, el Banco de Fomento, la Autoridad de los Puertos y otras, mediante la Ley. Ésta no incluye al Conservatorio como tal. También lo ha concedido a los empleados de la Corporación del Fondo del Seguro del Estado mediante la Ley Núm. 103 de 28 de junio de 1969 (11 L.P.R.A. secs. 3 y 8). En todos estos casos la Asamblea Legislativa ha concedido el refe-

rido derecho *de manera expresa*, como debe ser.([23]) En la Ley Núm. 141, *supra*, que rige actualmente al Conservatorio, no hay expresión alguna que permita concluir que la Asamblea Legislativa tuvo la intención de concederle a los profesores de esa Institución el derecho estatutario a la negociación colectiva, por lo que debemos resolver que éste no se les ha otorgado.

## C. *Otros factores*

 La Junta también concluyó que los amplios poderes y las facultades concedidas por ley al Conservatorio reflejaban la autonomía administrativa de éste, *y que eran comparables con los que ejercen las corporaciones privadas.* La Junta descansó en gran medida en esta apreciación para determinar que el Conservatorio era un patrono. Erró al decidir así. El énfasis dado por la Junta a este criterio fue claramente desproporcionado.

La amplia concesión legislativa de poderes al Conservatorio realmente sólo demuestra que dicha institución es efectivamente una corporación pública, a la cual la Asamblea Legislativa le ha concedido todas las facultades necesarias para cumplir con determinados propósitos. De por sí, la concesión de amplios poderes y facultades no es un criterio que automáticamente signifique que la instrumentalidad gubernamental en cuestión funciona como una empresa privada. Ni el historial de la Constitución ni ninguna de nuestras opiniones indica o intima que, por el mero hecho de que a una corporación pública se le autorice a ejercer los poderes que usualmente le son concedidos a tales instrumentalidades gubernamentales, automáticamente se deba concluir que la misma funciona como una empresa

---

([23]) Durante las últimas seis (6) décadas, la sindicación de los empleados públicos ha sido objeto de amplia discusión en el país, e incluso ha sido ocasión de agrio debate. La concesión del referido derecho estatutario es, pues, muy controversial. Por ello, no debemos concluir que una ley otorga tal derecho en ausencia de una clara expresión al respecto de la Asamblea Legislativa.

privada. La enumeración de poderes y facultades es pertinente sólo en la medida en que dichos poderes y facultades sean mayormente del tipo que tienen las empresas privadas solamente, lo que no es cierto en este caso. Muchos de los poderes del Conservatorio son indénticos a los que tienen las mismas empresas privadas como entidades puramente gubernamentales. Otros son, sencillamente, facultades propias a una institución que tiene los propósitos particulares del Conservatorio.

## VI

Analizados los hechos en el caso de autos a la luz de los criterios jurídicos pertinentes, determinamos que la balanza se inclina claramente en favor de la siguiente conclusión: respecto a sus profesores, el Conservatorio no es "patrono" para propósitos de la negociación colectiva de acuerdo con lo dispuesto en nuestra Constitución y en la legislación aplicable. En vista de ello, resolvemos que los profesores de dicha Institución no tienen derecho a negociar colectivamente.

## VII

Por los fundamentos antes expuestos, *se revocará la sentencia del Tribunal Superior que ponía en vigor la Decisión y Orden de Elecciones de la Junta.*

El Juez Asociado Señor Negrón García disintió con una opinión escrita. El Juez Asociado Señor Rebollo López disintió sin una opinión escrita.

— o —

Opinión disidente del Juez Asociado Señor Negrón García.

I

"La justicia es el alma del juez."[1] La decisión mayoritaria de hoy es *injusta* y torna en inoperante la cláusula constitucional que confiere a los empleados de las instrumentalidades públicas, que funcionan como empresas privadas, el derecho a sindicalizarse y a negociar colectivamente. Frustra judicialmente "la política pública del Gobierno de Puerto Rico en lo que respecta a las relaciones obrero-patronales[, que] consiste en desarrollar la negociación colectiva como uno de los instrumentos hacia la mayor producción y *hacia un más alto nivel de vida ...*". (Énfasis suplido.) *Nazario v. Tribunal Superior*, 98 D.P.R. 846, 851 (1970).

Esta injusticia estriba en concluir que la Corporación del Conservatorio de Música de Puerto Rico no es un "patrono" para efectos de las Secs. 17 y 18 de nuestra Carta de Derechos[2] —Art. II de la Constitución, L.P.R.A., Tomo 1— y según la definición del Art. 2 de la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 63(2).

---

[1] Frase de Cánovas del Castillo.

[2] Respectivamente, disponen:

"Los trabajadores de empresas, negocios y patronos privados y de agencias o instrumentalidades del gobierno que funcionen como empresas o negocios privados tendrán el derecho a organizarse y negociar colectivamente con sus patronos por mediación de representantes de su propia y libre selección para promover su bienestar."

. . . . . . . .

"A fin de asegurar el derecho a organizarse y a negociar colectivamente, los trabajadores de empresas, negocios y patronos privados y de agencias o instrumentalidades del gobierno que funcionen como empresas o negocios privados tendrán, en sus relaciones directas con sus patronos, el derecho a la huelga, a establecer piquetes y a llevar a cabo otras actividades concertadas legales.

"Nada de lo contenido en esta sección menoscabará la facultad de la Asamblea Legislativa de aprobar leyes para casos de grave emergencia cuando estén claramente en peligro la salud o la seguridad públicas, o los servicios públicos esenciales."

Con ese resultado se apartan del enfoque integral establecido en *A.A.A. v. Unión Empleados A.A.A.*, 105 D.P.R. 437 (1976). Allí hicimos un inventario de los criterios[3] determinantes para identificar qué es una instrumentalidad del gobierno que funciona como empresa o negocio privado. Como ya dijimos, "[n]ingún criterio es determinante por sí solo del problema que nos ocupa. Debemos examinar en cada caso la conjunción de factores existentes para a su luz resolver si la agencia concernida funciona o no como un negocio privado en el sentido constitucional". Íd., pág. 456.

## II

La Ley Núm. 77 de 30 de mayo de 1980, según enmendada por la Ley Núm. 2 de 31 de julio de 1985 (18 L.P.R.A. secs. 1163c–1163h)[4], creó la "Corporación del Conservato-

---

[3] Son:

"... [S]i los empleados de la agencia concernida están cubiertos por la Ley de Personal del Estado Libre Asociado; si los servicios prestados por la agencia, por su naturaleza intrínseca, nunca han sido prestados por la empresa privada; si la agencia está capacitada para funcionar como una empresa o negocio privado; si la agencia de hecho funciona como una empresa o negocio privado; el grado de autonomía fiscal de que disfrute la agencia; el grado de autonomía administrativa de que goce; si se cobra o no un precio o tarifas por el servicio rendido (precio que debe ser básicamente equivalente al valor del servicio); si los poderes y facultades concedidos en la ley orgánica de la agencia la asemejan fundamentalmente a una empresa privada; y si la agencia tiene o no la capacidad para dedicarse en el futuro a negocios lucrativos o a actividades que tengan por objeto un beneficio pecuniario. A estos criterios pueden añadirse otros, sin pretender agotar la lista: la estructura en sí de la entidad; la facultad de la agencia para demandar y ser demandada ilimitadamente; el poder de obtener fondos propios en el mercado general de valores a base de su récord económico y sin empeñar el crédito del Estado Libre Asociado; la facultad de adquirir y administrar propiedades sin la intervención del Estado; el punto hasta donde el reconocimiento a los trabajadores de la agencia de los derechos a que se refiere el primer párrafo de la Sec. 18 concuerda o no con el esquema constitucional.

"Ningún criterio es determinante por sí solo del problema que nos ocupa. Debemos examinar en cada caso la conjunción de factores existentes para a su luz resolver si la agencia concernida funciona o no como un negocio privado en el sentido constitucional." *A.A.A. v. Unión Empleados A.A.A.*, 105 D.P.R. 437, 455–456 (1976).

[4] Subsiguientemente, la Ley Núm. 141 de 9 de agosto del 1995 (18 L.P.R.A. sec. 1163c *et seq.*) enmendó la Núm. 77 de 30 de mayo de 1980 (18 L.P.R.A. secs. 1163c–1163h) a los fines de conferirle *autonomía fiscal y operacional*.

Debido a que el caso se originó bajo las disposiciones de la antigua ley, es conforme a ésta que debemos resolverlo. No es necesario pasar juicio sobre si la conclusión mayoritaria puede ser distinta bajo la ley actual. Al así obrar, nos guiamos por

rio de Música de Puerto Rico". Esta ley tiene como objetivo fomentar las destrezas musicales en la población mediante el ofrecimiento de cursos y la correspondiente concesión de grados académicos. Al presente, se encuentra adscrita a la Corporación de las Artes Musicales creada en 1985. La ley habilitadora confiere al Conservatorio de Música de Puerto Rico (Conservatorio) personalidad jurídica perpetua, capacidad para demandar y ser demandada, y poseer y utilizar un sello corporativo. Además, surge claramente que se constituyó como corporación pública *separada* del Estado. Veamos.

*Primero*, entre sus aspectos administrativos se destacan que puede *administrar su propio sistema de personal*, y dispone expresamente que *está exenta de la Ley de Personal del Servicio Público de Puerto Rico*. Puede adquirir, poseer y disponer de bienes muebles e inmuebles y formalizar contratos o convenios. Además, tiene absoluto control de sus propiedades y actividades, incluyendo sus fondos, y *mantiene su propio sistema de contabilidad*.

*Segundo*, en el área fiscal *posee absoluto* control sobre sus fondos. Tiene la capacidad para *aceptar préstamos o donaciones*, recibir fondos públicos y privados, y gastarlos o invertirlos conforme sus objetivos corporativos. Además, posee la facultad de mantener sus fondos en nombre propio y en cuentas separadas. El hecho de que el Conservatorio carezca de autoridad para emitir bonos y financiar sus operaciones no milita contra la determinación de que es una corporación pública, sujeta a negociación colectiva. Aunque la emisión de bonos en el mercado de valores constituye un método eficaz para levantar capital, *no es el único disponible*. El Conservatorio está facultado para obtener préstamos y así lograr un funcionamiento equivalente.

---

el principio de justiciabilidad que nos impide emitir opiniones consultivas. Este principio "[r]ecoge la norma de que no es función de los tribunales ni éstos pueden actuar como asesores o consejeros. ... *Intenta evitar que se produzcan decisiones en el vacío, en el abstracto o bajo hipótesis de índole especulativa*". (Énfasis suplido.) *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715, 721 (1980).

*Tercero*, el Conservatorio brinda, al igual que el sector privado, servicios de educación superior, pero no viene obligado a hacerlo gratuitamente. La única diferencia entre los servicios prestados por las instituciones educativas privadas y el Conservatorio es que éste los ofrece a un costo nominal. Cobrar tarifas bajas por sus servicios no desnaturaliza su capacidad como entidad generadora de ingresos. Lo esencial y determinante es "si la agencia tiene o no la *capacidad para dedicarse en el futuro a negocios lucrativos* o a actividades que tengan por objeto un beneficio pecuniario". (Énfasis suplido.) *A.A.A. v. Unión Empleados A.A.A.*, supra, pág. 455.

Reafirmamos "[e]l hecho de que debido a tarifas bajas o a otras razones las demandadas generalmente han perdido dinero en sus operaciones, no afecta a la cuestión de si están o no cubiertas por la Ley. Lo importante es si su autoridad o la naturaleza de los servicios por ellas rendidos las capacitan, si así lo desean, a operar en forma comparable a entidades privadas que puedan dedicarse al mismo negocio". *Junta Rel. Trabajo v. Junta del Muelle*, 71 D.P.R. 154, 159–160 (1950), reiterado en *J.R.T. v. Junta Adm. Muelle Mun. de Ponce*, 122 D.P.R. 318, 326–227 (1988).

La mayoría enfatiza que parte sustancial del presupuesto del Conservatorio proviene de una asignación legislativa. Tampoco es ello determinante, pues hemos visto que posee amplísimos poderes para aumentar sus ingresos a través de otros renglones, tales como la intensificación de esfuerzos para obtener fondos privados, el arrendamiento de estructuras y la inversión de fondos en el mercado de valores.

### III

La opinión mayoritaria hace referencia a unas expresiones hechas en *U.P.R. v. Asoc. Pur. Profs. Universitarios*, 136 D.P.R. 335, 396 (1994), para sostener que el Conserva-

torio no es "patrono". Precisamente, en aquella ocasión este Tribunal indicó que era "innecesario, para los fines del caso ante nos, resolver la importante cuestión jurídica de si la U.P.R. es o no un *patrono* para efectos de la Ley y de la Constitución. Evidentemente, resolver tal asunto podría tener implicaciones serias más allá de los confines de este caso". Íd., pág. 396. Cabe señalar que lo dicho por este Tribunal sobre ese aspecto constituye un *obiter dictum*, toda vez que expresamente se rechazó analizar esa controversia. De ahí que no debe invocarse como fundamento en el caso de autos.

La negociación colectiva no es una experiencia ajena al Conservatorio. Desde 1963 la Junta de Relaciones del Trabajo concluyó que éste era un "patrono" bajo el esquema constitucional prevaleciente.[5] Sus empleados de oficina están afiliados a la Unión Independiente de Empleados de la Compañía de Fomento Industrial. Hasta el presente *ha negociado colectivamente con sus empleados de oficina.*

La opinión mayoritaria subestima este importante dato. Argumentan que "[e]n las instancias en que sí hubo negociación colectiva, ocurrió únicamente respecto a los *empleados no docentes* del Conservatorio. No incluyó a los profesores, que son los que están ante nos ahora". (Énfasis en el original.) Opinión del Tribunal, pág. 441. Con todo respeto, no concebimos cómo el Conservatorio puede ser "patrono" para unos empleados y para otros no. Semejante diferencia en el trato carece al presente de justificación, máxime ante la conclusión de que los profesores "no son 'empleados gerenciales ...' ". Íd., pág. 428.

## IV

En *conclusión*, la Corporación del Conservatorio de Música de Puerto Rico, posee una estructura, unos poderes y

---

[5] Determinación de la Junta de 11 de diciembre de 1963 (D-333-S).

unas facultades que la asemejan fundamentalmente a una empresa privada. Puede contratar libremente, adquirir y disponer de bienes raíces y "[t]ener absoluto control de sus propiedades y actividades ...". 18 L.P.R.A. sec. 1163d(e). Tiene el control de sus fondos, los puede invertir para cualquier fin corporativo válido, planifica su presupuesto y administra su sistema de contabilidad y de personal sin la intervención del Gobierno central.

Forzoso es concluir —como lo hizo la Junta de Relaciones del Trabajo de Puerto Rico— que es una instrumentalidad pública, y sus empleados, bajo nuestra Constitución, tienen derecho a la sindicación y a la negociación colectiva.

El efecto de la decisión avalada por la mayoría es nefasto al movimiento obrero. Trasciende las partes en litigio, con el potencial de, *ex parte*, alterar los derechos de terceros. Anticipamos que, una vez expire el convenio colectivo entre el Conservatorio y la Unión que representa a los empleados de oficina, difícilmente dicha entidad continuará negociando con éstos los términos y las condiciones del empleo.

Al igual que los miembros del claustro de la Universidad de Puerto Rico, los derechos constitucionales del profesorado del Conservatorio han entrado en un estado permanente de "hibernación judicial".